UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

DALIA GAL, f/k/a DALIA GAL-GHELBER,                     :

                              Plaintiff,                :         05 Civ. 263 (CSH)

                - against -                             :

VIACOM INTERNATIONAL, INC., SIMON &                    :         **AFFIDAVIT**
SCHUSTER, INC., THE THOMSON
CORPORATION, THOMSON GALE, INC.,                        :
THORNDIKE PRESS, SIMON & SCHUSTER                       :
AUDIO, INC., a division of Simon & Schuster,            :
Inc., POCKET BOOKS, INC., a division of                 :
Simon & Schuster, Inc., and MARY HIGGINS               :
CLARK,                                                  :
                                                       :
                              Defendants.               :

------------------------------------------------------------- x

STATE OF NEW YORK    )
                     : ss.:
COUNTY OF NEW YORK   )

        MARCIA B. PAUL, being duly sworn, hereby deposes and says:

        1.      I am a member of the bar of this Court and of the firm of Davis Wright Tremaine

LLP, counsel for defendants Viacom International, Inc., Simon & Schuster, Inc., Simon &

Schuster Audio, Inc., Pocket Books, Inc. Mary Higgins Clark, ("Defendants") and also for

named defendants The Thomson Corporation, Thomson Gale, Inc., and Thorndike Press (the

"Thomson Defendants") in the above-captioned action.

        2.      I submit this affidavit in support of Defendants' motion for sanctions pursuant to

Fed. R. Civ. P., Rule 11, by reason of the refusal of counsel for plaintiff Dalia Gal to withdraw,

with prejudice, a frivolous complaint notwithstanding a Rule 11 safe harbor letter detailing

numerous erroneous allegations in that complaint. Defendants seek their attorneys fees and costs

incurred in connection with a motion to dismiss that complaint in an amount to be determined.

3.    On January 11, 2005, plaintiff Dalia Gal filed the complaint in this action alleging that Mary Higgins Clark's novel *The Second Time Around* infringes the copyright in Gal's screenplay *Immortalin*. The complaint, which identifies plaintiff's copyrighted screenplay by registration number, was signed by Richard Horowitz of Heller, Horowitz & Feit, P.C., counsel for plaintiff. A copy of the complaint is annexed hereto as Exhibit A.

4.    On February 23, 2005, I sent Mr. Horowitz a letter explaining that plaintiff's claims are wholly without merit given the utter lack of similarity – let alone the requisite substantial similarity – between *Immortalin* and *The Second Time Around*. In addition to citing cases and explaining that similarity of ideas or common stock elements cannot be the predicate of an action for copyright infringement, I also expressed my particular concern that the majority of the alleged similarities in the complaint were simply not in the two works expressly referenced in the complaint. I provided several detailed examples, including the following:

- In *Immortalin*, there is no scene that takes place "*at the Grand Hyatt hotel on 42nd street in Manhattan*". Complaint ¶ 23(a).

- In *Immortalin*, there is no "'bad guy' who stalks the female reporter and ends up killing others around her but never the reporter herself", not a single character is killed by a "bad guy" or anyone else for that matter in *Immortalin*. Complaint ¶ 14.

- In *Immortalin*, there is no "rival corporation" that "will stop at nothing . . . to obtain the drug at the lowest possible cost." Complaint ¶ 23(l). While there is a passing reference to a rival company who bribes its competitor to keep Immortalin off the market, this company has no apparent interest in obtaining the drug.

- In *Immortalin*, it is simply not true that "the lead character's involvement in the investigation directly causes the death of a witness she investigates by alerting the corporation to the witness's presence." Complaint ¶ 23(m). No such event occurs.

- In *Immortalin*, there is no "scientist working on the drug . . . [who] is the target of a failed hit-and-run accident." Complaint ¶ 23(n).

- In *Immortalin*, no "doctor secretly gave the drug he was working on to human patients against the rules of the corporation, FDA, and professional medical ethics." Complaint ¶ 23(o).

- There is no character named DeCarlo in *Immortalin*; the character Mitch has no last name. Complaint ¶ 23(c).

- The character in *Immortalin*, Bonnie, is described as "large", not "tall and willowy". Complaint ¶ 14.

- The wife of David Baron in *Immortalin*, Grace Baron, does not ask Alice "for help investigating the disappearance of her husband despite the fact that she is playing an intricate role in the conspiracy against her husband and his company and had a personal hand in said disappearance." Complaint ¶ 23(i). Nowhere in *Immortalin* does Grace ask Alice to investigate her husband's disappearance, nor clinic. Nor is she playing any "intricate role" in any conspiracy against her husband. She is simply having a sexual liaison with Robert MacGreal, in exchange for cocaine and other illegal drugs.

- In *Immortalin*, there is no "detective investigating [Alice's] possible connection to the murders" (Complaint ¶ 14) – indeed, there are no murders in *Immortalin* to investigate.

- In *Immortalin*, there is no "character from the scientist's past who is aware of the existence and location of the scientist's old records," as alleged in paragraph 14 of the Complaint.

5.      Based on these seemingly inexplicable inconsistencies, as well as an overall lack of substantial similarity between the two works, I urged Mr. Horowitz to withdraw the complaint and advised that, if he failed to do so, Defendants would file a motion to dismiss and thereafter seek Rule 11 sanctions against him and his firm, as well as prevailing party's attorneys' fees against his client. A copy of my letter is annexed hereto as Exhibit B.

6.      On March 2, 2005, Mr. Horowitz replied, stating that he and his client "unequivocally reject [Defendants'] contention that Ms. Gal's Complaint is without merit" and refused to withdraw the complaint. He did not provide any support for his position, nor did he address at all the incorrect allegations of the complaint detailed in my letter. A copy of Mr. Horowitz's letter is annexed hereto as Exhibit C.

7.     Accordingly, on March 30, 2005, we served and filed a comprehensive motion to dismiss the complaint, on behalf of Defendants, reviewing at length and comparing the two works and citing particular cases dismissing infringement claims with like or analogous alleged similarities. (As of that time, the Thomson defendants had not yet been served).

8.     On April 1, 2005, after reviewing our motion papers, Mr. Horowitz's colleague Evan Shusterman called me to explain that there was a "mistake" in the complaint and that plaintiff's claims were based not on the copyrighted screenplay referenced by registration number in the complaint (upon which Defendants naturally based their motion to dismiss), but on a later version that had never been registered. When I asked Mr. Schusterman why they failed to rectify that error when the facts were specifically pointed out in my February 23 letter, he said that they had simply assumed the letter was typical lawyer bluster (or words to that effect). Mr. Schusterman also informed me that plaintiff intended to file an amended complaint after registering the version of the screenplay upon which the allegations in the complaint were in fact based, mooting our motion.

9.     In a subsequent conversation with both Messrs. Horowitz and Shusterman, Mr. Horowitz apologized for what he termed an "innocent" error. Once again I asked why counsel did not even bother to investigate the glaring discrepancies specifically pointed out in my letter. Mr. Horowitz offered absolutely no response, save to say that much of the work we did on our motion would apply to the amended complaint, as well. That is simply not the case, as the new version of the screenplay differs substantially from the registered version referenced in the complaint and therefore an entirely new review, analysis and comparison must be made and legal research targeted to the specific claimed similarities must be undertaken. This includes not only the similarities previously alleged but absent, but similarities and differences by reason

entirely new elements in the new version of the screenplay.

    10.    For the reasons set forth in the accompanying memorandum of law, I respectfully request that this Court grant defendants' motion for Rule 11 sanctions.

_____
MARCIA B. PAUL (MBP 8427)

Sworn to before me this
6th day of May, 2005

_____
    Notary Public

EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DALIA GAL, f/k/a DALIA GAL-GHELBER,

                        **Plaintiff,**

           -against-

VIACOM INTERNATIONAL, INC., SIMON &
SCHUSTER, INC., THE THOMSON
CORPORATION, THOMSON GALE, INC.,
THORNDIKE PRESS, SIMON & SCHUSTER
AUDIO, INC., a division of Simon & Schuster,
Inc., POCKET BOOKS, INC., a division of
Simon & Schuster, Inc., and MARY HIGGINS
CLARK

                        **Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

*JUDGE HAIGHT*

*05 CV — 263*

*Case No.*

***COMPLAINT***

       PLAINTIFF Dalia Gal, by her attorneys Heller, Horowitz & Feit, P.C., as and for

her complaint against defendants, alleges as follows:

## JURISDICTION AND VENUE

      1.     This action arises under the copyright laws of the United States, 17 U.S.C.

§ 101, *et. seq.* This Court has subject matter jurisdiction over the claims asserted pursuant to 28

U.S.C. §§ 1331 and 1338.

      2.     The venue of this action is properly laid in this District pursuant to 28

U.S.C. § 1391(b) and (c).

## PARTIES

      3.     Plaintiff Dalia Gal ("Gal") has been and still is the owner of all rights, title

and interest in and to the copyright for the screenplay titled *"Immortalin"* (the "Work"), as well as

the current owner of all rights, title and interest to the cause of action alleged herein. Gal is a

1

citizen of Israel with a residence in Tel Aviv, Israel. At all relevant times, however, Gal was domiciled in the State of New York, County of New York.

4.       Upon information and belief, defendant Viacom International, Inc. is a corporation organized under the laws of Delaware with a principal place of business at 1515 Broadway, New York, New York. Viacom is the parent company of Simon & Schuster, Inc. and is in the business of producing and distributing hardcover books, paperback books, Audiobooks, and other media in the United States and worldwide.

5.       Upon information and belief, defendant Simon & Schuster, Inc. ("S&S") is a corporation organized under the laws of Delaware with a principal place of business at 1230 Avenue of the Americas, New York, New York. Simon & Schuster, Inc. is in the business of publishing, producing and distributing hardcover books, paperback books, Audiobooks, and other media in the United States and worldwide. S&S was and continues to be a publisher and distributor of the book titled *"The Second Time Around."* (*"STA"*)

6.       Upon information and belief, defendant Mary Higgins Clark ("Clark") is an individual residing in the state of New York and/or New Jersey with residences at 15 Werimus Brook Rd, Saddle River, New Jersey 07458 and 210 Central Park South, New York, New York 10019. Upon information and belief, Clark is an author under contract, having a distribution affiliation with S&S, and is the author credited with writing STA, the infringing work.

7.       Upon information and belief, defendant Pocket Books, Inc. ("Pocket"), is a subsidiary or division of Simon & Schuster, Inc., and is qualified to do business in the State of New York. Pocket maintains a principal place of business at 1230 Avenue of the Americas, New

2

York, New York. Pocket has published and disseminated the paperback version of the infringing work.

8.   Upon information and belief, defendant Simon & Schuster Audio, Inc. ("S&S Audio") is a subsidiary or division of S&S, and is qualified to do business in the State of New York. S&S Audio maintains a principal place of business at 1230 Avenue of the Americas, New York, New York. S&S Audio has published and disseminated the audio version of the infringing work.

9.   Upon information and belief, defendant The Thomson Corporation ("Thomson Corp.") is a corporation organized under the laws of Ontario, Canada and is qualified to do business in the State of New York. Thomson Corp. maintains a principal place of business at One Station Place, Stamford, CT 06902.

10.   Upon information and belief, defendant Thomson Gale, Inc. ("Gale") is a corporation organized under the laws of Delaware and is qualified to do business in the State of New York. Gale maintains a principal place of business at 27500 Drake Road, Farmington Hills, Michigan 48331. Gale is a subsidiary of Thomson Corp.

11.   Upon information and belief, defendant Thorndike Press ("Thorndike") is a subsidiary or division of Gale and is qualified to do business in the State of New York. Thorndike maintains a principal place of business at 295 Kennedy Memorial Drive, Waterville, ME 04901. Thorndike has published and disseminated the large-print version of the infringing work.

3

## INTRODUCTION

12.    This action arises out of the blatant infringement by defendants of Plaintiff's copyright in a screenplay that she authored. As explained in greater detail below, defendants' book titled *The Second Time Around* was far from an original work of the defendants or its credited author, Mary Higgins Clark. It was, in fact, a work that was knowingly and deliberately stolen by defendants from Ms. Gal's previously copyrighted screenplay, *Immortalin* -- the copyright for which was registered under Registration Number PAu2-484-847.

13.    The substantial similarities between the infringing work and Gal's screenplay are remarkable and can only be explained as a deliberate copying on the part of defendants. Except for the change in some character names, the entire concept of *The Second Time Around* -- a single female journalist's investigation of an elaborate conspiracy plot between two rival pharmaceutical companies competing to produce a miracle drug, where the larger corporation ends up falsifying results of the other company to ultimately purchase the smaller company, which has in fact created the viable vaccine, at an incredibly cheap price -- was taken from the Work. In both works, the scientist working on the miracle drug, who knows the truth of its potency, disappears; in both works, his wife is having a secret relationship with the head of the rival pharmaceutical corporation, and plays an integral role in the conspiracy against her husband.

14.    *The Second Time Around* also duplicates, to an absolutely remarkable degree, the characters of *Immortalin*, only changing some names, *and even then, certain names are still replicated.* With almost perfect parallelism, (a) *Immortalin* has Alice (the Protagonist; single female investigative journalist), Dr. David Baron (the missing scientist who spent his life

4

## FACTS

### The Copyrighted Work

15.    Ms. Gal is a critically-acclaimed, professional writer, who has written extensive English-language material for Israeli media. In early 1999, while living in New York City, Gal authored a first draft of a screenplay entitled "Alice and the Wonder Drug." After a few slight revisions and a title change, the screenplay of *Immortalin* was completed by the middle of 2000.

16.    The Work is wholly original and was created by Gal's own skill, labor, and judgment, and is copyrightable subject matter under the laws of the United States.

17.    Gal has complied in all respects with the Act of October 19, 1976, Pub. L. 94-953, 90 Stat. 2598, as amended by the Act of October 31, 1988, P.L. 100-568, 102 Stat. 2854, Title 17 U.S.C.A. Sec. 101-810, and all other laws governing copyright, and applied for copyright protection for the exclusive rights and privileges in and to the copyright of the Screenplay, and on or about July 27, 2000, received from the Register of Copyrights a Certificate of Registration, registration number PAu2-484-847. The Copyright Registration is annexed hereto as Exhibit "A".

18.    The Work has been published only by Gal, and all copies made by Gal or under her authority have been printed, reproduced, and published in strict conformity with the provisions of the Act of October of October 19, 1976, Pub. L. 94-953, 90 Stat. 2598, as amended by the Act of October 31, 1988, P.L. 100-568, 102 Stat. 2854, Title 17 U.S.C.A. Sec. 101-810, and all other laws governing copyright.

6

19.     On July 3, 2002, the Work was registered with the Writers Guild of America, west, Inc., registration number 875660.

**Delivery of the Work to Defendants and
Their Production of _The Second Time Around_**

20.     In 1999 and thereafter, Gal herself, or others by her personal request and direction, sent more than one-dozen copies of the Work, to various film industry contacts. In addition, dozens of copies of the Work were sent to artists and potential producers to determine their interest in the Work. Upon information and belief, one of the contacts and producers in the industry to whom the Work was sent, passed the Work along to S&S and defendant Clark and/or individuals associated with them. Following their receipt of the Work, Gal received no response from any of the defendants regarding the Copyrighted Work.

21.     In addition to the wide dissemination by mail of her script to various Hollywood producers, Gal presented her screenplay to at least three separate writers' conferences between 1999 and 2002. On at least one of these occasions, _Immortalin_ was selected from hundreds of scripts to be one of the top ten screenplays of the conference. Upon information and belief, these conferences were attended by many producers. Upon information and belief one of the individuals present at the conference obtained a copy of _Immortalin_ and passed the screenplay along to Clark and S&S and/or individuals associated with them.

22.     Upon information and belief, following the delivery of the Work to one or more of the defendants, and based upon and copied from the Work, Clark, together with various collaborators contributing to the writing of Ms. Clark, "wrote" the novel, _The Second Time Around_. Upon information and belief, at some time on or about April 2003, Viacom and

7

Thomson Corp., through their respective entities: S&S, S&S Audio, and Thomson Gale, through Thorndike Press, published and produced the book *"The Second Time Around,"* which included themes and scenes that were substantially similar to and directly copied from the themes and scenes in the Work.

## Selected, Illustrative Similarities Between the Work and *The Second Time Around*

      23.    The following are selected and illustrative similarities between the work and *The Second Time Around*:

      a.    At a formal meeting, where the pharmaceutical company introduces its miracle drug to the public, a disgruntled investor/patient bursts into the meeting, interrupting the conference, chastising the corporation for the ineffectiveness of the drug. In both works, *this meeting takes place at the Grand Hyatt hotel on 42nd street in Manhattan.*

      b.    The pharmaceutical company was preparing the drug to "halt the progression of disease." *Immortalin*'s target goal is fighting degenerative brain diseases, such as Alzheimer's or Parkinson's, while *STA* changed the disease to cancer in general.

      c.    The name "DeCarlo" is used in both works. *Immortalin* has "Mitch DeCarlo," where *STA* has "Marcia 'Carley' DeCarlo."

      d.    The name "Lynn" is used in both works. *Immortalin* has "Detective Lynn," where *STA* has "Lynn Spencer."

      e.    The name "Greene" is used in both works. *Immortalin* has "Alice Greene," where *STA* has "Doctor Greene."

8

      f.      The lead character expresses regret at not having the miracle drug in time to save their respective beloved family member from their respective afflictions. In *Immortalin*, Alice wants the drug for her mom (and her boss's wife), while in *STA*, Carley wants a second chance to save her child (and the daughter of a family she investigates for her story).

      g.      In *Immortalin*, David is the brilliant scientist who nearly drives himself crazy pursuing the miracle cure and Fred is an executive of the pharmaceutical company where David worked who is handsome, charismatic, and easy to talk to. *STA*'s character of Dr. Nick Spencer is an amalgamation of these two characters from *Immortalin*.

      h.      The lead character is a female journalist, single by way of divorce, who lives in a brownstone apartment in New York City with a broken elevator.

      i.      The wife of the missing doctor specifically asks the female journalist for help investigating the disappearance of her husband despite the fact that she is playing an intricate role in the conspiracy against her husband and his company, and had a personal hand in said disappearance.

      j.      The lead character reporter is expressed as striving to advance her position at the paper (or, in *STA*, to move up to a larger publication).

      k.      When the female reporter first goes to meet with the CEO of the pharmaceutical company, the CEO directs their meeting to take place at a small seating area wholly contained within the CEO's large office.

      l.      The plot of the Work involves the pharmaceutical industry competing for the billions of dollars that will undoubtedly come with the patent for the miracle

drug. The rival corporations will stop at nothing including tampering with test results, witness

intimidation, and even murder, in order to obtain the drug at the lowest possible cost.

        m.     The lead character's involvement in the investigation directly

causes the death of a witness she investigates by alerting the corporation to the witness's

presence.

        n.     As a result of the pharmaceutical company's efforts to remove

anyone who knows anything about the conspiracy, a scientist working on the drug, against the

interests of the pharmaceutical company, is the target of a failed hit-and-run accident.

        o.     The doctor secretly gave the drug he was working on to human

patients against the rules of the corporation, FDA, and professional medical ethics.


**Defendants' Infringement**

        24.     With the production and publishing of *"The Second Time Around,"*

defendants willfully and, upon information and belief, with full knowledge of the rights of

Plaintiff, infringed plaintiff's copyright by publishing, offering for sale and selling within the

United States and elsewhere, and otherwise commercially exploiting, without Gal's consent, the

book titled *"The Second Time Around,"* in the form of hardcover, paperback, Audiobook, large-

print, and other media, which in all forms was copied from the Work.

        25.     Defendants, by their acts, have taken advantage of Gal's knowledge and

skill and have capitalized upon and exploited the Work for their own benefit, and have realized

profit and other benefits belonging to plaintiff.

26.     The aforesaid acts of defendants in selling and offering for sale and otherwise commercially exploiting *The Second Time Around*," which was copied from the Work, constitute copyright infringement.

27.     As a direct and proximate result of the foregoing acts of infringement by defendants, Gal has been damaged by defendants and continues to be damaged in an amount not yet fully determined. By reason of defendants' acts, defendants have also caused irreparable injury to Gal, which injury will continue so long as defendants continue to market and commercially exploit *The Second Time Around*.

28.     Defendants have been notified about the infringement of Gal's Work but nevertheless continue to infringe.

29.     There is a substantial likelihood that Ms. Gal will be able to succeed on the merits of this action.

WHEREFORE, plaintiff demands judgment against defendants as follows:

a.     That defendants, their agents and servants, be preliminarily and permanently enjoined from infringing on plaintiff's Copyright in any manner, and from selling, marketing or otherwise disposing of or commercially exploiting any books, paperback, large-print, Audiobook or any other media of *The Second Time Around*;

b.     That defendants be required to pay to plaintiff actual damages plus interest which plaintiff has sustained as a consequence of defendants' infringement of plaintiff's Copyright, and to account for all gains, profits and advantages derived by defendants from "*The Second Time Around*," and/or -such other damages, including statutory damages for willful

11

infringement in an amount to be established at trial as within the provisions of the Copyright

Statute;

       c.       That defendants be required to recall from their customers and

deliver up to be impounded during the pendency of this action all copies of the book, in all

formats, including hardcover, paperback, large-print, Audiobook or other media of *"The Second*

*Time Around"* in their possession or under their control, and to deliver up for destruction all

infringing copies and all matter for making such infringing copies;

       d.       That defendants be required to pay to plaintiff the costs and

disbursements of this action, including plaintiff's attorney's fees under 17 U.S.C. § 500; and

       e.       Such other and further relief as to this Court may seem just and

proper.

### JURY DEMAND

       Plaintiff hereby demands its right to trial by jury on all issues triable to a jury.

Dated:       New York, New York
               January 11, 2005

                              **HELLER, HOROWITZ & FEIT, P.C.**

                              By: *Richard F. Horowitz*
                                  Richard F. Horowitz (RH-9451)

                              *Attorneys for Plaintiff*
                              292 Madison Avenue
                              New York, New York 10017
                              (212) 685-7600

EXHIBIT B

LAWYERS



# Davis Wright Tremaine LLP

ANCHORAGE    BELLEVUE    LOS ANGELES    NEW YORK    PORTLAND    SAN FRANCISCO    SEATTLE    SHANGHAI    WASHINGTON, D.C.

MARCIA B. PAUL
DIRECT (212) 603-6427
marciapaul@dwt.com

1633 BROADWAY
NEW YORK, NY 10019-6708

TEL (212) 489-8230
FAX (212) 489-8340
www.dwt.com

February 23, 2005

<u>**VIA FAX (212) 696-9459**</u>
<u>**AND CERTIFIED MAIL**</u>

Richard F. Horowitz, Esq.
Heller, Horowitz & Feit, P.C.
292 Madison Avenue
New York, New York 10017

      Re:    Rule 11 Safe Harbor Letter
           <u>Dalia Gal v. Viacom, et al.; 05 Civ. 263 (CSH)</u>

Dear Mr. Horowitz:

    We write this letter as counsel for each of the defendants in the above-referenced action, instituted by your client Dalia Gal ("Gal"). Having reviewed the complaint in this action, Gal's screenplay *Immortalin* and Mary Higgins Clark's novel *The Second Time Around*, as well as the overall facts and circumstances surrounding Gal's claims, we believe your allegations and the claim based upon them to be wholly without merit. As we explained more fully below, there is no basis for any claim that copyrightable expression of your client has been copied and/or infringed. Indeed, a simple review of the screenplay and the novel conclusively demonstrates that the two works are far from substantially similar. Equally troubling is the fact that many of the "similarities" alleged in the complaint are complete fabrications. Consequently, should you fail to withdraw Gal's complaint immediately and with prejudice, our clients will file a motion to dismiss and thereafter seek Rule 11 sanctions against you and your firm, as well as prevailing attorneys' fees against your client.

    Boiled down to its essence, your client claims ownership of the concept or idea of a tale of suspense in which a female journalist investigates a story about a breakthrough prescription drug that is being kept from the market by a pharmaceutical company. But it is axiomatic that copyright law protects only your client's *expression* of that concept, not the concept itself. *See* 17 U.S.C. § 102. As discussed below, any other perceived similarities naturally flow from this broad premise or are generalized or random similarities that, as a matter of law, do not come

Richard F. Horowitz, Esq.
February 23, 2005
Page 2



close to raising a material factual issue about substantial similarity.[1]  The tortured attempts in the complaint to create the illusion of similarity where, quite simply, none exists, are not only unavailing, but, we believe, sanctionable.  The simple fact is that, looking at the two works themselves, as the law requires, it is impossible for any reasonable reader to conclude that the two works are even remotely similar, let alone substantially similar.

Two works are substantially similar for purposes of determining copyright infringement only if "an ordinary lay observer would overlook the dissimilarities between the artistic (protectible) aspects of the two works and would conclude that one was copied from the other." *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994) (citing *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759 (2d Cir. 1991)); *Knitwaves, Inc. v. Lollytogs Ltd., Inc.*, 71 F.3d 996, 1002 (2d Cir. 1995).  In analyzing the works at issue, the court must determine "whether the similarities shared by the works are something more than mere generalized idea[s] or themes." *Walker v. Time-Life Films, Inc.*, 784 F.2d 44, 48-49 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S. Ct. 2278 (1986) (quoting *Warner Bros. v. American Broadcasting Cos.*, 654 F.2d 204, 208 (2d Cir. 1981)).  As a general proposition, "the essence of infringement lies in taking not a general theme but its particular expression through similarities of treatment, details, scenes, events and characterization." *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (1976); *see also Craft v. Kobler*, 667 F. Supp. 120, 123 (S.D.N.Y. 1987) ("craftsmanship and art in the presentation of the material").

Therefore, any similarity in the premise of the two works (a female journalist investigating the reasons a miracle drug is being suppressed by a pharmaceutical company) cannot form the basis for a finding of substantial similarity.  This is so even where two works share greater similarities in concept than are present here.  *See Denker v. Uhry*, 820 F. Supp. 722, 730 (S.D.N.Y. 1992) (no substantial similarity even though both works at issue were "about an elderly, white Jewish person who, in the face of advancing age and resulting loss of independence, requires the assistance of a black helper, and after initial resistance, develops a friendship with the helper").

Moreover, "[m]aterial or themes commonly repeated in a certain genre are not protectible by copyright." *American Direct Marketing, Inc. v. Azad Intern., Inc.*, 783 F. Supp. 84, 95

---

[1] To prove copyright infringement, Gal would also have to prove that the defendants had access to *Immortalin*.  While we do not address that issue in detail here, it is plain that the allegations of access in the complaint are preposterous.  Basically, Gal claims that, because the unproduced screenplay was sent to "film industry contacts" and presented at "writers' conferences," she believes that the screenplay must have found its way to someone in the publishing industry and eventually to one of the defendants.  Of course, Gal offers no support whatsoever for this exceedingly tenuous theory, not to speak of sufficient predicate for a good faith allegation upon information and belief.  Even if there had been some basis for this allegation, that would not save Gal's claim, given the complete lack of substantial similarity, as detailed herein.

Richard F. Horowitz, Esq.
February 23, 2005
Page 3



(E.D.N.Y. 1992). Thus, your client cannot claim a monopoly on any similarity consisting of such stock themes, clichés, or *scenes-a-faire*. A good example of what is considered *scenes-a-faire* can be found in *Walker v. Time-Life Films, Inc.*, 615 F. Supp. 430 (S.D.N.Y.), *aff'd*. 784 F.2d 44, 50 (2d Cir. 1985), *cert. denied*, 476 U.S. 1159 (1986). That court found that common elements in police fiction such as drunks, prostitutes, foot chases, morale problems among policemen or the prototypical Irish cop were not protectible. *See also Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) ("[e]lectrified fences, automated tours, dinosaur nurseries, and uniformed workers . . . flow from the uncopyrightable concept of a dinosaur zoo"); *Alexander v. Haley*, 460 F. Supp. 40, 45 (S.D.N.Y. 1978) (copyright does not protect elements that are "indispensable, or at least standard, in the treatment of a given topic"). Even if a particular plot device had originated with Gal, she could not claim any monopoly in it. "[G]eneralized plot devices . . . are not entitled to copyright protection." *Denker*, 820 F. Supp. at 732.

Nor can a copyright infringement claim be sustained when it is based on trivial, random incidents of little importance to the expression in either the plaintiff's or defendants' works. The Second Circuit in *Hoehling v. Universal City Studios Inc.*, 618 F.2d 972, 979 (2d Cir.), *cert. denied*, 449 U.S. 841 (1980), found no actionable similarity where the alleged similarities related to "random duplication of phrases and sequence of events" since such elements were merely *scenes-a-faire*. *See also Williams*, 84 F.3d at 590 (lists of specific similarities are "inherently subjective and unreliable, particularly where the list emphasizes random similarities throughout the work" rather than whether the lay observer would consider the works as a whole substantially similar). Most of the "similarities" in the complaint are either of this nature or, worse, non-existent. Indeed, Gal's claims are reminiscent of those alleged by the plaintiff in *Walker*, 784 F.2d at 50-51, which the Second Circuit held did not raise a material issue as to similarity, because, aside from the "difficulty of comparing unified artistic works on the basis of such scattered analogies," the claimed similarities "either fail[ed] to materialize or prove[d] entirely insubstantial" and differences were overwhelming.

Gal does not allege that even a single sentence of *The Second Time Around* was copied verbatim from or a paraphrase of her screenplay and therefore you do not even purport to base her claims on what has been termed "fragmented literal similarity". Rather, your theory apparently rests on a mishmash of supposed similarities of general themes, character types, and scattered plot elements, otherwise known as "comprehensive non-literal similarity". 3 *Nimmer on Copyright* § 13.03[A][1]. That construct allows for a finding of substantial similarity only where the "fundamental essence or structure of one work is duplicated in another". *Id.* at 1329. In articulating what constitutes pattern or structure for purposes of comprehensive non-literal copying, courts emphasize that pattern or structure cannot be so abstract a concept as to extend protection to abstract ideas. *Whelan Assoc. v. Jaslow Dental Laboratories*, 797 F.2d 1222, 1234-36 (3d Cir. 1986), *cert. denied*, 479 U.S. 1031, 107 S. Ct. 877 (1987). Despite the complaint's claim of "perfect parallelism" one only need skim the two works to conclude that there has been no copying of the "fundamental essence or structure" of *Immortalin*. The characters, dialogue, sequence of events and plot of the two works are all utterly different. Where, as here, "the

Richard F. Horowitz, Esq.
February 23, 2005
Page 4



differences in plaintiff's and defendants' treatment of [similar] ideas, including the differences in their total look and feel, the interactions of the characters and the plot, are so pronounced . . . no reasonable jury could find that the works are substantially similar." *Hogan v. DC Comics*, 48 F. Supp.2d 298, 311 (S.D.N.Y. 1999); *see also Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 913 & n.11 (2d Cir. 1980) (numerous differences between works tend to undercut substantial similarity); *Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp. 1248, 1261 (S.D.N.Y. 1995) (no substantial similarity where works at issue exhibit "differences in plot and structure that far outweigh the general likeness").

Even a cursory review of *Immortalin* and *The Second Time Around* reveals that no such abstract similarity exists; to the contrary, they are very *dis*similar works, a fact which no amount of artful or disingenuous pleading can alter. To the extent the complaint finds *any* common ground between the works, it does so only by alleging a general unprotectible theme and ignoring the specific plots and characters of either *Immortalin* or *The Second Time Around* or both. By way of example, the complaint claims that "[i]n both works, the scientist working on the miracle drug, who knows the truth of its potency, disappears." Complaint ¶ 13. First, Gal cannot "own" the notion of including the inventor of a drug as a character because this is "indispensable, or at least standard", in any story about a breakthrough drug, and is therefore unprotectible. To have the character "disappear" is also an unprotectible idea, stock element or generalized plot device that can be expressed in innumerable ways. Indeed, the "disappearance" of *Immortalin's* Dr. David Baron does not bear the slightest resemblance to the "disappearance" of *The Second Time Around's* Dr. Nicholas Spencer in its details, its dramatic effect, in the role the "disappearance" plays in the plot, or any other aspect than can even arguably be said to constitute expression.

In *Immortalin*, the "disappearance" of Dr. Baron occurs a quarter into the screenplay. At first, we only know he has "disappeared," but then we learn that Baron has checked himself into a mental clinic after a confrontation with Robert MacGreal, the CEO of the company backing Immortalin research. Baron goes to the clinic in fear after MacGreal announces he is cutting off Immortalin funding and Baron angrily tells MacGreal he knows about MacGreal's affair with his wife Grace. MacGreal calls security and tells Baron if he ever returns "it'll be the end" of him. He is released at the end of the screenplay, apparently financially independent due to Immortalin's success.

In marked contrast, in *The Second Time Around*, the reader learns in the very first paragraphs of the novel that Dr. Nicholas Spencer, the inventor of a cancer vaccine, has died in a plane crash after apparently looting his company of tens of millions of dollars. The truth about Spencer's plane crash is a continuing source of mystery throughout the novel – Did he die? Did he abscond with the money? Has he been spotted in Switzerland? Has his secretary/mistress joined him there? In the last pages of the novel we learn that Spencer's wife secretly drugged him just before he was to pilot his private plane to Puerto Rico. The drug knocked him out without warning and he was killed in the crash. The dissimilarity of every aspect of these two

Richard F. Horowitz, Esq.
February 23, 2005
Page 5



"disappearances" save for the fact of the disappearance itself, precludes any claim of copyright infringement. *See Green v. Lindsey*, 885 F. Supp. 469, 484 (S.D.N.Y.) (where fictional component "differ[s] in all but the general idea, [it] is unprotectible"), *aff'd*, 9 F.3d 1537 (2d Cir. 1992), *cert. denied*, 510 U.S. 1202 (1994).

The complaint is littered with similar examples of this totally inappropriate and highly misleading pleading tactic. Another example is the allegation that both works include a character of the "reporter's 'tall and willowy' best friend, expressed as quite different looking than the lead character, who is in a position, thanks to her profession to know what is going on at the pharmaceutical company." Complaint ¶ 14. But, again, it is immediately apparent from the relevant passages of *Immortalin* and *The Second Time Around* that the two allegedly similar characters are entirely different. The allegation, at best, identifies an unprotectible character type. The character in *Immortalin*, Bonnie, is described as "large", not "tall and willowy" (just one of many indisputably erroneous statements in the complaint). Bonnie is the medical correspondent at a newspaper and a major character throughout the screenplay (although has no particular special knowledge about the suppression of *Immortalin*). But the character in *The Second Time Around*, Gwen Harkins, an attorney, appears in only one scene early in the novel and she appears to know absolutely nothing about "what is going on at the pharmaceutical company," beyond what the public knows. After providing a little exposition about the frequency of medical breakthroughs since the nineteenth century, the character disappears completely from the novel. This alleged similarity is neither real nor substantial.

Many of your other alleged similarities are even further removed from the actual content of these two works. For example, the complaint claims that "in both works, [the inventor's] wife is having a secret relationship with the head of the rival pharmaceutical corporation, and plays an integral role in the conspiracy against her husband". Apart from the fact that the inventor's wife in both works is having an affair with someone in a drug company, virtually nothing about this allegation is accurate. In *The Second Time Around*, the reader learns (in a one sentence throwaway in the epilogue) that Spencer's wife was having an affair with the head of a rival company. In contrast, in *Immortalin*, Baron's wife is *not* having an affair with the head of a rival drug company, but with the CEO of the company funding her husband's drug research. Further, Baron's wife is a rather minor role in the screenplay and does *not* play any active part (integral or otherwise) in any conspiracy against her husband – she is simply a drug-addicted artist, who sleeps with MacGreal in exchange for drugs. In contrast, Spencer's wife – the half-sister of the journalist heroine, a former high-level publicist, and a far more developed character than Grace – is a major player in *The Second Time Around* and in the conspiracy against her husband, personally giving him the fatal pill that leads to his death. These characters share no protectible similarities in either their personality traits or their plot functions. *See Williams v. Crichton*, 84 F.3d 581, 589 (2d Cir. 1996) (no substantial similarity between characters where "beyond the superficial similarities, many differences emerge, including motivations . . ., the skills and credentials of the characters, and their interpersonal relationships").

Richard F. Horowitz, Esq.
February 23, 2005
Page 6



Another example of the complete disconnect between your complaint and these two works is the allegation that both works contain the following scene: "At a formal meeting, where the pharmaceutical company introduces its miracle drug to the public, a disgruntled investor/patient bursts into the meeting, interrupting the conference, chastising the corporation for the ineffectiveness of the drug. In both works, *this meeting takes place at the Grand Hyatt hotel on 42nd street in Manhattan*." Complaint ¶ 23(a) (emphasis in original). Again, this allegation is a passel of inaccuracies. Despite the italics in the Complaint, the *Immortalin* scene takes place at a press conference held at *the offices of the National Institute For Brain Research in Boston*. The scene in *Second Time Around* takes place at the Grand Hyatt in Manhattan, but has nothing to do with introducing its cancer cure to the public. Rather it is a shareholders meeting where the board announces that the miracle drug is a fraud and the inventor, who died in a plane crash two weeks earlier, looted the company.

The only kernel of truth in this allegation is that both scenes include an outburst by a man at a meeting, but in neither case is this man a patient, and only in *The Second Time Around* is he an investor. In *Immortalin*, the man who interrupts the triumphant announcement of the anti-aging drug claims that his brother's health declined after taking the drug – although the man is immediately discredited when it is announced that he was unaware that his brother was given a placebo in a clinical trial. This man has no other role in the screenplay. By contrast, in *The Second Time Around*, the man who disturbs the grim shareholders meeting is furious because he took out a second mortgage on his home to invest in the apparently fraudulent cancer cure because his daughter suffers from the disease. This character goes on to play a large supporting role in *Second Time Around*, when he becomes the prime suspect in an arson investigation, although he is innocent. The only common elements in these scenes are that someone with an ailing relative interrupts a drug company meeting. But neither Gal nor anyone else can have a monopoly over such elements, and certainly not when the elements in the allegedly infringing work are expressed so differently.

As the above representative examples amply demonstrate, there simply is no similarity, much less substantial similarity in protectible expression between the parties' respective works. And these are by no means the most egregious examples of the misleading nature of the allegations of the complaint. Many "similarities" you have alleged have absolutely no basis in fact. A prime example of this is the allegation that both works "include a 'bad guy' who stalks the female reporter and ends up killing others around her but never the reporter herself." This is a fair description of *The Second Time Around*, in which a psychotic character named Ned brutally murders at least six people over the course of the novel, and intends to kill the journalist Carley as well, but spares her at the last moment and commits suicide instead. But the allegation bears no resemblance to anything that happens in *Immortalin*: not a single character is killed by a "bad guy" or anyone else for that matter. The only violence occurs when the reporter Alice is struck by a hit-and-run driver (who is never identified). Alice not only survives, but is apparently not seriously injured and is back on her feet in no time. Notably, there is no similar attack on Carley in *The Second Time Around*.

Richard F. Horowitz, Esq.
February 23, 2005
Page 7



Among the numerous other alleged "similarities" that simply do not exist include:

- In *Immortalin*, there is no "rival corporation" that "will stop at nothing . . . to obtain the drug at the lowest possible cost." Complaint 23(l). While there is a passing reference to a rival company who bribes its competitor to keep Immortalin off the market, this company has no apparent interest in obtaining the drug.

- In *Immortalin*, it is simply not true that "the lead character's involvement in the investigation directly causes the death of a witness she investigates by alerting the corporation to the witness's presence." Complaint ¶ 23(m). No such event occurs.

- In *Immortalin*, there is no "scientist working on the drug . . . [who] is the target of a failed hit-and-run accident." Complaint ¶ 23(n).

- In *Immortalin*, no "doctor secretly gave the drug he was working on to human patients against the rules of the corporation, FDA, and professional medical ethics." Complaint ¶ 23(o).

- There is no character named DeCarlo in *Immortalin*; the character Mitch has no last name. Complaint ¶ 23(c).[2]

- The wife of David Baron in *Immortalin*, Grace Baron, does not ask Alice "for help investigating the disappearance of her husband despite the fact that she is playing an intricate role in the conspiracy against her husband and his company and had a personal hand in said disappearance." Complaint ¶ 23(i). Nowhere in *Immortalin* does Grace ask Alice to investigate her husband's disappearance, nor is there any indication that she did anything to make her husband flee to a mental clinic. Nor is she playing any "intricate role" in any conspiracy against her husband. She is simply having a sexual liaison with Robert MacGreal, in exchange for cocaine and other illegal drugs.

---

[2] The fact that a minor character in *The Second Time Around* (Dr. Greene) shares a commonplace surname with the very different lead character in *Immortalin* (Alice Greene) is a mundane coincidence and cannot support an infringement claim. *Cf. Hogan v. DC Comics*, 48 F. Supp.2d 298, 311 (S.D.N.Y. 1999) (substantial similarity not established despite the fact that main character in each work shared exact name "Nicholas Gaunt"). It is even less compelling that Lynn is both the first name of a major character in *The Second Time Around* and the last name of a detective who plays a small role in *Immortalin*. That the complaint stoops to this level of "similarity" is further confirmation of the objective unreasonableness of Gal's copyright claim.

Richard F. Horowitz, Esq.
February 23, 2005
Page 8



- In *Immortalin*, there is no "detective investigating [Alice's] possible connection to the murders" (Complaint ¶ 14) – indeed, there are no murders in *Immortalin* to investigate.

- In *Immortalin*, there is no "character from the scientist's past who is aware of the existence and location of the scientist's old records," as alleged in paragraph 14 of the Complaint.

The above is not a full catalogue of the inaccurate and/or misleading allegations in the complaint, but these examples should be more than sufficient to demonstrate the frivolous nature of Gal's claims in this action. We are quite frankly appalled by these inaccuracies, misstatements or, most charitably, wholesale exaggerations. This far exceeds even the outer limits of advocacy.

At best, Gal can point only to a list of random, unprotectible elements that appear in both works, such as both main characters live in a brownstone (albeit in distinctly different neighborhoods and with distinctly different family compositions), or both main characters are divorced (albeit in the *Immortalin* Alice is recently divorced and in close contact with her former spouse, an important character in the screenplay's plot; whereas in *The Second Time Around*, Carley has been divorced for 10 years with no continuing interaction with her ex-husband, a non-entity in the plot). Such a list cannot be even a starting point for a claim of substantial similarity, particularly where, as here, the plot lines and character relationships in the two works are so markedly dissimilar. We trust that you will review the two works in their entirety (as we assume you did prior to filing the complaint) with the benefit of the cases and treatise cited herein and conclude, as would any reasonable reader/lawyer, that there is no basis in fact or law for Gal's claim of copyright infringement.

For all of the foregoing reasons, we believe that the complaint is wholly without merit and our clients should not be forced to defend such objectively unreasonable, indeed frivolous, claims. As noted above, should you refuse to withdraw the complaint, we will be forced to move to dismiss and/or for judgment on the pleadings, and thereafter seek Rule 11 sanctions and prevailing party attorney's fees under the Copyright Act. The foregoing is written without waiver of our client's rights and remedies, all of which are expressly reserved. We trust we will hear from you promptly.

Very truly yours,

Marcia B. Paul

cc: Emily Remes, Esq.

EXHIBIT C

# HELLER, HOROWITZ & FEIT, P.C.

JACOB W. HELLER
RICHARD F. HOROWITZ
ELI FEIT
LAWRENCE J. TOSCANO
STUART A. BLANDER
SIGMUND S. WISSNER-GROSS
MAURICE W. HELLER
ALAN A. HELLER
CLIFFORD J. BOND
MAY ORENSTEIN

ALLEN M. EISENBERG
JOSEPH S. SCHICK

ATTORNEYS AT LAW
292 MADISON AVENUE
NEW YORK, N.Y. 10017
(212) 685-7600

NAHUM L. GORDON
MARTIN STEIN
COUNSEL

CABLE ADDRESS
HELLFEITER, N.Y.

TELECOPIER
(212) 696-9459

WORLD WIDE WEB
HTTP://WWW.HHANDF.COM

WRITER'S E-MAIL
RFHOROWITZ@HHANDF.COM

March 2, 2005

**Via Email and Regular Mail**

Marcia B. Paul, Esq.
Davis Wright Tremaine LLP
1633 Broadway
New York, NY 10019-6708

Re:    *Gal v. Viacom et al*

Dear Ms. Paul:

In response to your letter of February 23, 2005, please be advised that we and our client unequivocally reject your contention that Ms. Gal's Complaint is without merit, your threat to seek sanctions and your demand that our client withdraw the Complaint.

Per Mr. Welch's request, we consent to an extension of your time to respond to the Complaint to March 30. We will, of course, expect similar courtesies from you, if necessary.

Very truly yours,

Richard F. Horowitz

#166263 v1 - Letter to Marcia Paul rejecting Rule 11 letter