UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
DALIA GAL, f/k/a DALIA GAL-GHELBER,                          :
                                                            :
                          Plaintiff,                        :
                                                            :
                  -against-                                 :
                                                            :        05 Civ. 0263 (CSH)
_____                    :
VIACOM INTERNATIONAL, INC., SIMON &                          :
SCHUSTER, INC., THE THOMSON                                  :
CORPORATION, THOMSON GALE, INC.,                             :        MEMORANDUM OPINION
THORNDIKE PRESS, SIMON & SCHUSTER                            :        AND ORDER
AUDIO, INC., a division of Simon & Schuster,                 :
Inc., POCKET BOOKS, INC., a division of                      :
Simon & Schuster, Inc., and MARY HIGGINS                     :
CLARK,                                                       :
                                                            :
                          Defendants.                       :
------------------------------------------------------------- x

HAIGHT, Senior District Judge:

      This is an action for copyright infringement under the Copyright Act of 1976, as amended,

17 U.S.C. § 101, *et seq.* Plaintiff Dalia Gal ("Gal" or "Plaintiff") alleges that, through the

publication of a novel credited to Mary Higgins Clark, the above-named defendants ("Defendants")

infringed Gal's copyright in a screenplay she had authored.

      Currently, there are two motions pending before the court: (1) Defendants' motion to dismiss

the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), based on the asserted

lack of substantial similarity between the two works (in connection with this motion, Defendants ask

to be awarded attorneys' fees and costs); and (2) Defendants' motion for sanctions against Plaintiff's

counsel pursuant to Federal Rule of Civil Procedure 11.

      For the following reasons, I deny Defendants' motion to dismiss, as well as their request for

an award of attorneys' fees and costs, and I also deny Defendants' motion for sanctions.

# I.  <u>BACKGROUND</u>

Plaintiff, a professional writer, asserts that she is the author of, and has at all relevant times held a valid copyright in, a screenplay entitled *Immortalin* ("the Screenplay").  *See* Amended Complaint ¶¶ 3, 15-18.  It is Plaintiff's contention that the novel *The Second Time Around* ("the Novel"), credited to Mary Higgins Clark and published or otherwise made available by the other named defendants in 2003, unlawfully infringes on the Screenplay, which was completed in the middle of 2000, by including "themes and scenes that were substantially similar to and directly copied from the themes and scenes in the [Screenplay]."  *Id.* ¶ 22.  Plaintiff cites several alleged examples of "selected, illustrative similarities" between the two works.  *Id.* ¶ 23.

Plaintiff made these allegations and claims in her original complaint, filed January 11, 2005.  In that original complaint, however, Plaintiff's counsel mistakenly referenced the copyright registration number of an older, substantially different version of the Screenplay.[1]  *See* Affidavit of Marcia B. Paul, counsel for Defendants ("Paul Aff."), attached to Motion for Sanctions, ¶ 8.  When, using the incorrect registration number supplied by Plaintiff, Defendants obtained a copy of what they believed was the relevant version of the Screenplay, Defendants were apparently (and rightfully) surprised to find that many of the alleged similarities between the two works did not exist, because the characters, scenes, or events described by Plaintiff's counsel in the complaint simply were not present in Plaintiff's work.  Defendants notified Plaintiff's counsel of this fact by letter, and asked counsel to withdraw the (what appeared to be frivolous) complaint, based on the absence of any real similarity between the works.  *See id.* ¶¶

---

[1] In fact, the current, relevant version of the Screenplay was not copyrighted at the time of the filing of the original complaint, but was apparently properly copyrighted prior to the filing of the amended complaint.  *See* Affidavit of Richard F. Horowitz, counsel for Plaintiff, ¶ 7.

4-5.

Instead of investigating Defendants' claim that the instances of alleged similarity could not be found in Gal's work, Plaintiff's counsel simply maintained that the similarities existed, and asserted that the claim would be pressed on. *See id.* ¶ 6. Understandably, Defendants then moved to dismiss the complaint for failure to state a claim, since the similarities asserted by Plaintiff apparently did not exist between the two works. *See id.* ¶ 7. It was only after Defendants' motion to dismiss was filed that Plaintiff's counsel undertook an inquiry and discovered that a mistake in identification of the work had been made. *See id.* ¶ 8. Thereafter, the proper version of the Screenplay was copyrighted and provided to Defendants, and the complaint was amended accordingly. Defendants then moved to dismiss the amended complaint, asserting that, even considering the "correct" version of the Screenplay, Plaintiff was unable as a matter of law to show substantial similarity between the two works. *See* Motion to Dismiss Amended Complaint.

Further, based, *inter alia*, upon the failure of Plaintiff's counsel to correct the error in identifying the correct version of Gal's work, even when given notice that such was necessary, Defendants moved to have the Court impose sanctions against Plaintiff's counsel, pursuant to Federal Rule of Civil Procedure 11. Defendants ask that Plaintiff's counsel be ordered to pay all costs and attorneys' fees for time spent preparing the motion to dismiss. *See* Motion for Sanctions.

## II. <u>DISCUSSION</u>

**A.**     **<u>The Motion to Dismiss Pursuant to Rule 12(b)(6)</u>**

1.     *The Rule 12(b)(6) Standard of Review*

The district court should grant a Rule 12(b)(6) motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). On a motion to dismiss, a district court must accept a plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain,* 478 U.S. 265, 283 (1986), and such factual allegations must be "construed favorably to the plaintiff," *LaBounty v. Adler,* 933 F.2d 121, 123 (2d Cir. 1991) (citations omitted). "The review of such a motion is limited, and the issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Recovery may appear remote and unlikely on the face of the pleading, but that is not the test for dismissal." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996) (internal citations and quotation marks omitted).

2.     *Copyright Infringement*

a)     <u>Basic Requirements</u>

In order to prevail on an infringement claim, a plaintiff must prove "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361 (1991)). In the case at bar, Defendants do not challenge Gal's claim to a valid copyright in the Screenplay. *See* Defendants' Memorandum in Support of Motion to Dismiss at 3. Thus, the Court's focus is on the second requirement, that of copying.

The copying requirement can be broken down into two parts.  As an initial matter, a plaintiff must first show that the defendant "actually copied" her work.  *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001) (citing *Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 747 (2d Cir.1998)).  Actual copying may be shown by either direct or indirect evidence.  *Id.* (citing *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 140 (2d Cir.1992)).  "Indirect evidence [of actual copying] may include proof of 'access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony.'"  *Id.* (quoting *Laureyssens*, 964 F.2d at 140).  "But not all copying results in copyright infringement."  *Id.* at 268.  A plaintiff must demonstrate "substantial similarity" between the defendant's work and the protectible elements of plaintiff's work.  *Id.* (citations omitted).

In the case at bar, Plaintiff does not offer direct evidence of actual copying.  As for indirect evidence, for the purpose of the motion to dismiss only Defendants concede their access to Plaintiff's work.  The parties, however, do not seem to address the question of whether there are similarities "probative of copying between the works," *Laureyssens*, 964 F.2d at 140, instead focusing on whether the Screenplay and the Novel are substantially similar with regard to protectible material.  In such a case, it seems reasonable for the Court to assume, for the purposes of the motion, that sufficient probative similarity exists to raise the inference of actual copying, and that, therefore, the Court's inquiry may focus on the "substantial similarity" requirement in the context of infringement.  *See Green v. Lindsey*, 885 F.Supp. 469, 479 (S.D.N.Y. 1992).

      b)      <u>"Substantial Similarity"</u>

      (i)      *Comparison of the Works*

In order to address the substantial similarity issue, the Court has undertaken its own

review of the Novel and the Screenplay, as the works themselves are the best evidence of the presence or absence of substantial similarity, s*ee Walker v. Time Life Films,* 784 F.2d 44, 49 (2d Cir.1986) ("Each of the panel members has read the book and reviewed the film."), and supersede and control contrary descriptions of them, s*ee id.* at 52 (upholding district judge's decision not to view the voice-over version of film submitted by plaintiff).

The following is a significantly abridged description of the Novel and the Screenplay:

The Screenplay:

The Screenplay opens at a press conference, held at the Grand Hyatt hotel in Manhattan, where a large drug company announces the results of its new "miracle" anti-aging drug, called Immortalin. Involved in the presentation by the company are two scientist/doctors, David Baron and Fred Leary, and the CEO of the company, Robert MacGreal. The main character of the story, Alice Greene,[2] is at the conference as a reporter for the New York Report; she is accompanied by her photographer, Mitch DeCarlo. The drug company's presentation is interrupted by an irate man, complaining that Immortalin trial treatment failed to cure his brother, and in fact made him worse. MacGreal asserts that the man's brother did not, in fact, receive Immortalin, but was given a placebo as part of the trial. Also at the conference, Baron is asked a question about the competing drug Grow, to which he responds by disparaging the competing drug.

After the conference, Alice undertakes to investigate the scientists involved in the Immortalin project. To that end, she attends a party hosted by MacGreal. At the party, Alice is introduced to Baron's attractive wife, Melissa. Alice later observes Melissa using cocaine, as

_____

[2] Alice is an attractive 28-year old divorcee with a young daughter.

well as kissing MacGreal. At the same party, MacGreal's wife, Gloria, has a discussion with Bruce Lawrence, CEO of another large drug company (which produces Grow), wherein Gloria tells Lawrence that MacGreal will follow through with a deal between the two drug companies. Then the two CEOs meet to talk behind closed doors. When Alice later tells Bonnie, her friend and the medical correspondent at the paper, about the meeting between MacGreal and Lawrence, Bonnie guesses that Lawrence is trying to acquire the rights to Immortalin, in order to prevent the product from competing with Grow in the market.

On a later date, MacGreal informs Baron and Leary that he intends to sell the Immortalin rights to Lawrence, and he asks each of the scientists to sign a non-compete agreement. Baron, who is in the process of developing an improved generation of the drug, refuses to sign, and is fired. Leary signs the agreement.

Meanwhile, Alice's sick mother is treated with Grow, and her condition deteriorates. Bonnie tells Alice of a rumor regarding a new generation of Immortalin, which might be able to help Alice's mother.

Alice goes to the drug company's office to interview Leary and Baron about Immortalin, but Baron does not appear. Leary denies the existence of a new generation of the drug. Leary asks Alice out for drinks that night, and they have sex at his apartment. The next morning, Alice surreptitiously steals Melissa Baron's address from Leary's address book before leaving.

Apparently later that day, Alice intrudes upon a meeting between MacGreal, Lawrence, and Leary, demanding to know the whereabouts of the missing Baron. She mentions that she saw MacGreal and Baron's wife together at the party. Alice leaves without gaining any new information.

Later, Alice visits artist Melissa Baron in her East Village studio, asking after her husband. Meanwhile, outside on the street, Abraham Zacharias, who we later learn is a terrorist-for-hire, watches Melissa's apartment. Melissa is not happy about Alice's visit, and does not appear concerned about her missing husband. Melissa does, however, tell Alice that Baron's mentor, a Dr. Williams, may know his whereabouts. Alice then leaves, and goes to visit Williams. After some prompting, Alice earns Williams' trust, primarily by invoking her ill mother, who she hopes could be cured by Baron's most recent version of Immortalin. Williams tells Alice that Baron is staying at an apartment in Queens, scared into hiding. Alice then goes to visit Baron, and is followed by Zacharias, who has been tailing her.

Baron's apartment doubles as a lab. He admits Alice, who asks about the rumored new generation of Immortalin, on her mother's behalf. Baron admits that there have been attempts made on his life, and also mentions that his research records are located in the basement of his old house in New Jersey, which has been foreclosed upon.

Meanwhile, in MacGreal's mansion, he and Gloria, his wife, discuss the consummation of the deal with Lawrence's drug company. MacGreal complains about Alice's snooping, and admits to staging a hit-and-run attempt on Baron. He also mentions pressure from Nord Biotech, a firm that apparently was also bidding on the rights to Immortalin.

At night, while Alice is home in her house, she notices Zacharias outside watching her. The next day, she reports this to Bonnie, who tells her she should alert the police. Meanwhile, Zacharias bugs Alice's home phone. Gloria connects with Zacharias after watching him trail Alice; Gloria hires him to get the rumored new generation of Immortalin for her, so that she can use it herself to reverse the flow of years, which have not been kind to her appearance.

Alice, using her home phone, calls Mitch to ask him to join her in visiting the foreclosed home where Baron's research is supposedly stashed. Zacharias hears this, and beats Alice and Mitch to the house. There, he steals computer files as well as vials of what appears to be the new Immortalin. When Alice and Mitch stumble upon Zacharias, he kills Mitch while Alice manages to escape. Alice manages to call the police, and they arrive on the scene after Zacharias has fled.

In the next scene, apparently the following day, Gloria and Lawrence meet for lunch, and she provides him with one of the vials stolen by Zacharias. Gloria wants Lawrence's labs to test the drug, with a view to injecting her with the contents.

At the newspaper, Alice, who had been investigating the Immortalin story without authorization, is placed on leave by the paper. She vows, however, to continue her investigation. To that end, she visits Baron at his apartment, where he reveals that the research and vials left at the foreclosed house were fake – the vials contained only an old derivative of Immortalin.

The next day, Alice arrives uninvited at the MacGreal mansion, where MacGreal and Gloria are engaged in a bitter fight about MacGreal's affair with Melissa Baron. Gloria tells Alice how much money MacGreal stands to make from selling the rights to Immortalin, in hopes that Alice will publish the numbers so that Gloria will not be cheated if they divorce. Gloria is angered when Alice informs her she is no longer working for the paper.

Later, while Alice is driving, her brakes fail and she crashes her car. Zacharias, who has been following Alice, makes a phone call, stating that Alice has been neutralized. Alice is hospitalized, but not mortally injured. Leary, who still has romantic feelings for Alice, visits her in the hospital. He also says that her accident was probably the result of someone trying to eliminate her, probably the same person who killed Mitch. Leary also reveals that Baron was, in

fact, working on a new generation of Immortalin, and that, as a result of the drug companies' deal to sell the rights to Immortalin, effectively keeping it off the market, Baron went into hiding to continue developing the drug. We also learn that Nord Biotech attempted to acquire Immortalin, but was outbid by Lawrence; Nord Biotech wanted the drug in order to develop germ warfare.

In the next scene, Gloria visits Lawrence's labs, to be injected with the stolen Immortalin, which she mistakenly believes is the new generation. However, she reacts badly to the injection (of an old derivative of Immortalin), and develops horrible boils all over her face. Gloria flies into a rage. Later, Gloria, still in a disturbed state, visits Melissa Baron at her apartment, demanding to know where Melissa's husband is keeping the new generation of Immortalin. A fight ensues, and Gloria kills Melissa. As she escapes from Melissa's apartment, Gloria encounters Zacharias, who has been looking for her to demand payment for supplying the stolen drug. When Gloria refuses to pay him, saying he stole the wrong drug, he kills her.

A day later, Alice and Leary visit Baron and Williams at Baron's apartment. Leary reveals that they have learned that Zacharias works for a terrorist organization that runs Nord Biotech, which organization is attempting to develop powerful germ weapons. Zacharias then arrives at the apartment, demanding the new generation Immortalin. A fight breaks out, and, after a violent struggle, Leary kills Zacharias.

Alice breaks the bioterrorism story and is rehired by the paper. Her mother is then treated with the new Immortalin developed by Baron, and shows dramatic improvement. The drug is rushed through the FDA approval process. Alice and Leary decide to begin a romantic relationship.

<u>The Novel</u>[3]:

The Novel's story is told through two alternating perspectives: (1) a first person account from the perspective of the protagonist, Marcia "Carley" DeCarlo, a 32-year old divorcee newspaper columnist;[4] and (2) a third person account from the perspective of Ned Cooper, an unbalanced man who snaps after his wife's accidental death and embarks on a vengeful killing spree. The Novel opens at a stockholders' meeting of Gen-stone, a company developing a promising cancer cure, held at the Grand Hyatt hotel in New York City. Two weeks earlier, its president and the inventor of the drug, Nick Spencer, was reportedly killed when his private place crashed. Thereafter, rumors began circulating that there had been serious setbacks in the ongoing drug experiments and that Spencer had looted the company. Carley, who is also the stepsister of Spencer's presumed widow Lynn, attends the meeting. Angry shareholders shout questions; one of them, Martin Bikorsky, claims that he will lose his house because he invested in the company in the hope of saving his cancer-stricken daughter. After the meeting, someone sets fire to Lynn's mansion. When she is hospitalized, Carley visits her.

The story then shifts to Ned's perspective. He is in the lobby of that same hospital where his wife Annie used to work. When Annie learned that he had sold their dream house to invest in Gen-stone, she drove off and was killed in an auto accident. Ned runs into a doctor who prescribes something for his hand (which we later learn was burned while setting fire to Lynn's

---

[3] This summary of the Novel is taken, with some changes, from Defendants' brief, as I find Defendants' summary to be accurate. *See* Defendants' Memorandum In Support of Motion to Dismiss at 6-10.

[4] We learn that, some years before the commencement of the action in the Novel, Carley lost a baby to a heart defect.

mansion).

Carley is hired by a newspaper to do an in-depth profile of Nick, which gives her the opportunity to investigate his disappearance. She interviews the company's chairman, Charles Wallingford, and Dr. Celtavini, head of its labs, at their offices. Wallingford explains that another company, Garner Pharmaceuticals, had invested heavily in Gen-stone; he also speculates that Nick had been looting Gen-stone for years.

Carley again visits Lynn at the hospital, where the two are startled by a strange man (the crazed Ned, as we later learn), who excuses himself moments before the police arrive to question Lynn about the fire. The police already have a suspect for the arson: Bikorsky, one of the shareholders who interrupted the meeting. Carley then visits Dr. Broderick, an old Spencer family friend. Nick's father had been dedicated to finding a cancer cure; after he died, Nick gave Broderick his father's research. Shortly before the plane crash, Nick asked Broderick to return his father's notes and was upset to learn that a red-haired man from Gen-stone had already taken them.

Meanwhile, Ned's landlady, Mrs. Morgan, tells him he has to leave when his lease is up. Ned drives to the site of the dream house he and Annie once shared. He unsuccessfully tries to rent a room from an old neighbor, Mrs. Shafley, and then runs into Harry Harnik, the owner of their old house. Ned blames them all for Annie's death and decides to kill Lynn, Carley, Mrs. Morgan, Mrs. Shafley, Mr. Harnik and Harnik's wife, Bess.

Carley asks the two researchers at Gen-stone, Dr. Celtavini and Dr. Kendall, about the red-haired man. Celtavini denies knowledge of any such person and Carley gives Dr. Celtavini Broderick's number so he can investigate further. Carley then interviews Nick's secretary,

Vivian Powers.

Meanwhile, as Ned plots the murders, he has stopped taking his medication, his burned hand is infected, and he has started talking to his dead wife.

Carley meets with Bikorsky, his wife, Rhoda and their cancer-stricken daughter Maggie. Rhoda persuaded Bikorsky to invest in Gen-stone after meeting Nick at a hospice. Carley is more convinced than ever that Bikorsky did not set the fire. She then learns that Broderick has been struck by a hit-and-run driver. A news report announces that a piece of Nick's clothing has been found near the site of the plane crash. Seeking to comfort Lynn, Carley finds her at her Manhattan apartment with Wallingford, Gen-stone's president, and others including Adrian Garner, the owner of Garner Pharmaceuticals, the company that had invested in Gen-stone.

Carley receives some threatening e-mails, including one that reads "Who was the man in Lynn Spencer's mansion a minute before it caught fire?" The suspicious circumstances of Broderick's hit-and-run accident persuade Nick's secretary, Vivian, to reveal to Carley not only that Nick had earlier tried to get his father's records (which Carley knew from Broderick), but that shortly before the plane crash, he nearly had an accident when his accelerator stuck. Carley now suspects that Nick has been murdered. She meets with the caretakers of the Spencer mansion who dislike Lynn (who is Nick's second wife). They reveal that Nick had a romantic interest in Vivian. Now, instead of murder, Carley wonders whether the plane crash was staged so that Vivian and Nick can be together. She visits the hospice where Nick volunteered and learns that he may have illegally given the drug to two patients, who quickly improved.

Ned goes to the pharmacy for something to treat his burned hand. When he thinks that the cashier Peg suspects him of starting the fire, he kills her.

Carley learns that Vivian has disappeared. News reports surface that Nick has been spotted in Switzerland. Both Carley and the police suspect that Vivian is on her way there to meet him.

After Ned gets a visit from two detectives investigating Peg's murder, he buries his rifle at Annie's grave. He realizes that he is the prime suspect in Peg's death and accelerates his plan to murder the others.

The police trace the threatening e-mails to someone claiming to be Nick Spencer and using the password "Annie". When Vivian's neighbor's car is missing, the police suspect that Vivian used the car to flee. Carley again visits Gen-stone and meets with Wallingford and a Garner Pharmaceuticals lawyer, Lowell Drexel.

Ned retrieves his rifle from Annie's grave and kills his landlady, Mrs. Morgan. He hears Annie's voice telling him next to kill his old neighbors.

Carley learns that Vivian has been found alive but unconscious in the neighbor's car.

Ned hides in one of the deserted buildings on Lynn's mansion grounds, waiting to kill Mrs. Shafley and the Harniks.

After another meeting with Drexel, Carley takes some Garner Pharmaceuticals pamphlets. She agrees to meet with Lynn the next day.

Meanwhile, Ned sees Lynn talking to the same man he had seen her with the night of the fire. Ned leaves, kills Mrs. Shafley and the Harniks, then returns.

Carley learns that Nick's former in-laws, who also invested in Gen-stone, took custody of Nick's son Jack after Nick married Lynn; they are convinced that Nick is dead, since he would never leave Jack.

Ned hears that the three bodies of his old neighbors have been found.  The police suspect Ned of shooting them, as well as Peg and his landlady.  He has just two more people to kill – Lynn and Carley.

Carley also learns of the killings and remembers seeing Ned at the hospital the day after the fire.

At the mansion, Ned overhears a message confirming a meeting between Lynn and Carley the next day.  He plans to kill them both at that time.

On her way to the mansion, Carley stops at the airport where Nick began his ill-fated flight.  She questions a waitress who overheard an argument between Nick and Lynn before his flight left, leading Carley to theorize that Nick did not fake his disappearance, and that Vivian was kidnaped.  As she skims the Garner Pharmaceuticals pamphlets, she sees an old photo of the now-gray lawyer Drexel: he had red hair.  Carley arrives at the mansion, confronts Lynn with her knowledge that Drexel is the mysterious red-haired man and that Lynn and Nick argued at the airport.  Drexel enters holding a gun, but moments later Ned enters, shoots Drexel and Lynn, and then forces Carley to drive him to Annie's grave.  En route, Carley realizes that Ned thinks he is talking to Annie, so she tells him that she would like to write a story about how much Annie loved him.  At the cemetery, Ned threatens Annie, but then kills himself.

In the epilogue, we learn that Garner had masterminded the whole plot in order to sabotage the experiments, force Gen-stone into bankruptcy, and then acquire the patent on the sure-to-be-lucrative drug.  He was having an affair with Lynn and gave her a pill to slip into Nick's drink at the airport.  When it took effect several hours later, it knocked Nick unconscious, and he crashed the plane.  Garner is indicted for murder.  At a memorial service for Nick,

Bikorsky's wife reveals that Nick had given the vaccine to Maggie, who is well on her way to being cured.

(ii)  <em>Applicable Law</em>

"[T]he determination of the extent of similarity which will constitute a substantial and hence infringing similarity presents one of the most difficult questions in copyright law, and one which is the least susceptible of helpful generalizations."  *Warner Bros., Inc. v. American Broadcasting Cos., Inc.*, 654 F.2d 204, 208 (2d Cir. 1981) (quoting the leading text, *Nimmer on Copyright*).  The Second Circuit cases confront this difficulty by fashioning the "ordinary observer" test to determine the extent of similarity between two works.  In Judge Learned Hand's formulation, there is substantial similarity where "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same."  *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960).  More recently, the Second Circuit has said that the ordinary observer test "queries whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work," and went on to observe that "[i]n comparing works for infringement purposes, we examine the works' total concept and feel."  *Hamil America, Inc. v. GFI*, 193 F.3d 92, 100, 102 (2d Cir. 1999) (citations and internal quotation marks omitted).  "It is only where the points of dissimilarity exceed those that are similar and those similar are -- when compared to the original work -- of small import quantitatively or qualitatively that a finding of no infringement is appropriate."  *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992).

One might think that the question of substantial similarity is so fact-intensive that it must always be for a jury to decide.  However, the Second Circuit has made it plain that the question

16

may be resolved by courts as a matter of law. "[A] district court may determine noninfringement as a matter of law on a motion for summary judgment either when the similarity concerns only noncopyrightable elements of plaintiff's work, or when no reasonable trier of fact could find the works substantially similar." *Walker*, 784 F.2d at 48 (citation omitted). The Second Circuit makes the same legal determination *de novo* on an appeal from a district court's similarity finding, the judges of that court having concluded that they can see and read as well as district judges. "In considering substantial similarity between two items, we review the district court's findings *de novo* -- not on the clearly erroneous standard -- because what is required is only a visual comparison of the works, rather than credibility, which we are in as good a position to decide as was the district court." *Hamil America*, 193 F.3d at 97 (citations and internal quotation marks omitted). *See also Walker*, 784 F.2d at 49 ("Each of the panel members has read the book and viewed the film"; district court's conclusion that no reasonable observer could find substantial similarity between the protectible elements of plaintiff's book and defendant's movie affirmed).

While the Second Circuit's decision in *Walker* sanctioned the determination of substantial similarity *vel non* as a matter of law on a motion for summary judgment, there is ample authority for the proposition that a district court may make that determination on a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See, e.g.*, *Bell v. Blaze Magazine*, No. 99 Civ. 12342, 2001 WL 262718 (S.D.N.Y. Mar. 16, 2001), at *3; and *Boyle v. Stephens, Inc.*, No. 97 Civ. 1351, 1998 WL 80175 (S.D.N.Y. Feb. 25, 1998), at *4 ("If after examining the works themselves, this Court determines that there is no substantial similarity, then the plaintiff here can prove no facts in support of his claim which would entitle him to relief -- the standard for

dismissal under Rule 12 (b)(6).") (citation omitted).  *Accord Nelson v. PRN Productions, Inc.*, 873 F.2d 1141, 1143-1144 (8th Cir. 1989) ("The trial judge could properly determine the matter of substantial similarity as a matter of law and did so by granting defendants' motion to dismiss the copyright count on the ground that it failed to state a claim for infringing use.").  While there are some cautionary expressions *contra*, *see Great American Fun Corp. v. Hosung New York Trading Inc.*, 935 F. Supp. 488 (S.D.N.Y. 1996) (where "at least some of the parties' marionettes bear a strong, if not striking similarity," the question of substantial similarity "should be reserved for the trier of the fact -- or at least the summary judgment stage"), the case at bar turns upon the question of substantial similarity between two written works, and the requisite comparison between them would not be enhanced in any manner by discovery preceding a motion for summary judgement.[5]

Finally, it is axiomatic that "a copyright does not protect an idea, but only the expression of an idea." *Kregos v. Associated Press,* 3 F.3d 656, 662 (2d Cir.1993) (citation omitted).  "The distinction between an idea and its expression is an elusive one." *Williams v. Crichton*, 84 F.3d 581, 587-88 (2d Cir. 1996).  In *Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), Judge Learned Hand stated:

> Upon any work, . . . a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise, the [author] could prevent the use of his 'ideas,' to which, apart from their expression, his property is never extended.

---

[5]  We may say with the poet: "The Moving Finger writes; and, having writ, / Moves on: nor all your Piety nor Wit / Shall lure it back to cancel half a Line, / Nor all your Tears wash out a Word of it."  Edward Fitzgerald, *The Rubaiyat of Omar Khayyam*, stanza 71.

*Id.*

After reviewing the two works at issue in this case, it is clear that there are indeed similarities between the Novel and the Screenplay. For example, both open at a drug company meeting in the Grand Hyatt hotel in Manhattan, which meeting is interrupted by a disgruntled man complaining about the ineffectiveness of a newly developed "miracle drug" with regard to an ill family member. Both works have a relatively young, divorced, ambitious female reporter as protagonist, and both involve a conspiracy involving drug companies seeking to gain the patent on the miracle drug in order to reap huge profits. In both works, the scientist developing the drug goes missing, and is targeted as part of the conspiracy. Also, in each work, the wife of the lead scientist is having an affair with the head of one of the drug companies involved, and both wives are murdered. With regard to total concept and feel, *see Hamil America*, 193 F.3d at 102, both the Novel and the Screenplay are fast-paced, action-packed, twist-filled thrillers that end positively, when the conspiracy is exposed, the miracle drug is shown to work, and the protagonist begins a new romantic relationship.

However, in order to constitute substantial similarity, these "similarities shared by the works [must amount to] something more than mere generalized idea or themes," *Warner Bros.*, 654 F.2d at 208. It is the province of the court, not a jury, to determine as a matter of law whether certain material is copyrightable expression or non-copyrightable idea. *See CK Co. v. Burger King Corp.*, 122 F.3d 1055 (Table), 1995 WL 595526, at *2 (2d Cir. 1995) ("Whether material is protectible under 17 U.S.C. § 501 is an issue of law for the court, and does not implicate the average observer test for substantial similarity."). While Defendants may argue that

the similarities between the works relate to generalities and not protectible expressions of ideas, enough specificity exists to satisfy the Court that Plaintiff has alleged infringement of copyrightable expressions of ideas.

Even accepting the existence of sufficient allegations of infringement of copyrightable material, it does not necessarily follow that Defendants cannot show lack of substantial similarity as a matter of law, because, while "[t]he ordinary observer test focuses on the similarities and not the differences . . . , this Circuit has also recognized that numerous differences tend to undercut substantial similarity." *Warner Bros., Inc. v. American Broadcasting Cos., Inc.*, 523 F. Supp. 611, 616 (internal quotation marks and citation omitted); *see also Walker*, 784 F.2d at 49 (substantial similarity lacking as a matter of law where "differences in plot and structure far outweigh [the] general likeness [between the works]"). As can be seen from a comparison of the above abridged versions of the works, there are obvious differences between the Novel and the Screenplay. Most significantly, the Novel tells its story through two different, interrelated viewpoints, those of Carley in the first person and Ned in the third person, while the Screenplay has a single third person perspective. Additionally, the Screenplay has no character really analogous to Ned, whose 'story' comprises a significant part of the Novel. Further, it bears noting that there is no terrorism subject matter in Defendants' work, as there is in Plaintiff's. Nonetheless, certain dissimilarities between the works will not serve to automatically relieve the infringer of liability, as "no copier may defend an act of plagiarism by pointing out how much of the copy he has not pirated," *Rogers*, 960 F.2d at 308 (citation omitted).

In the case at bar, despite differences between the Screenplay and the Novel, when the similarities are viewed through the prism of Rule 12(b)(6) I am unable to conclude that "no

reasonable trier of fact could find the works substantially similar." *See Walker*, 784 F.2d at 48.

Accordingly, Defendants' motion to dismiss is denied.

        3.     *Attorneys' Fees and Costs*

Defendants ask to be awarded attorneys' fees and costs. The Copyright Act allows a court to award reasonable attorneys' fees to the prevailing party in an infringement action. *See* 17 U.S.C. § 505. As I have decided, however, that Defendants' motion to dismiss should be denied, thereby declining to declare a winner at this stage in the proceedings, an award of attorneys' fees and costs is not appropriate at this time.

**B.**     <u>The Motion for Sanctions Pursuant to Rule 11</u>

"The central purpose of Rule 11 is to deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (citation omitted). Under Rule 11, a plaintiff's counsel must undertake reasonable inquiry to ensure that papers filed are "well-grounded in fact, legally tenable, and not interposed for any improper purpose," or risk sanctions. *Id.* (internal quotation marks and citation omitted). Further, if counsel learns that a claim has become unsupportable after filing, sanctions may be appropriate if that claim is not withdrawn. *See Gambello v. Time Warner Commc'ns, Inc.*, 186 F. Supp. 2d 209, 230 (E.D.N.Y. 2002). When determining whether a Rule 11 violation has occurred, the court should use an objective standard of reasonableness. *See MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 73 F.3d 1253, 1257-58 (2d Cir.1992) (citing *Business Guides, Inc. v. Chromatic Commc'ns Enters., Inc.,* 498 U.S. 533, 548 (1991)). Additionally, counsel are entitled to rely on the objectively reasonable representations of their clients, *see Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1329-30 (2d Cir.1995), and all

doubts must be resolved in favor of the signer of the pleading, *see Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir.1993) (citing *Associated Indem. Corp. v. Fairchild Indus.*, 961 F.2d 32, 34 (2d Cir.1992)).

In Defendants' Memorandum of Law in Support of Its Motion for Sanctions ("Def. Rule 11 Mem."), Defendants in effect claim that Plaintiff's counsel should be sanctioned for one or both of the following reasons: (1) Plaintiff's complaint is frivolous because it "claim[s] substantial similarity based exclusively on alleged similarities in ideas and common stock elements"; and/or (2) Plaintiff's complaint is frivolous because it "expressly reference[s] the 'wrong' version of [Plaintiff's] screenplay," and Plaintiff's counsel did not correct the mistake even when notified of the need to do so. Def. Rule 11 Mem. at 1.

Regarding the first reason stated above, as I have already concluded in this opinion that Plaintiff's infringement claim alleges enough to survive a Rule 12(b)(6) motion to dismiss, it follows that that claim is not "baseless" for Rule 11 purposes, thus no sanctions are warranted with regard to that asserted reason.

The second reason proposed by Defendants, however, presents a closer question. Although I understand how Plaintiff's counsel could have initially made the mistake in identifying the relevant version of Gal's work,[6] it would have been entirely reasonable and advisable for Plaintiff's counsel, before filing suit, to verify that the copyright registration number provided by Gal (and referenced in the complaint) did, in fact, refer to the correct version

---

[6] Plaintiff's counsel claim that they ascertained that Gal's original work was copyrighted, obtained the original certificate of registration from the copyright office, and had no reason to suspect that the version of the Screenplay presented to them by Gal was not the work actually covered by the registration. *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Impose Rule 11 Sanctions ("Plaint. Rule 11 Mem.") at 10, 13.

of Plaintiff's screenplay, particularly in light of the fact that a proper copyright registration (or pending registration) is a prerequisite to filing a claim for infringement, *see Whimsicality, Inc. v. Rubie's Costume Co., Inc.*, 891 F.2d 452, 453 (2d Cir. 1989). Nonetheless, in the first instance, the mistake seems an honest one, and would not appear to be of the sort that would incline the Court to impose sanctions pursuant to Rule 11.

However, I am troubled by Plaintiff's counsel's failure to discover and correct the error, and provide the correct version of the screenplay to Defendants, even when Defendants' counsel wrote a letter requesting withdrawal of the complaint and expressly highlighting the fact that certain of the similarities asserted by Plaintiff's counsel *simply did not exist in Plaintiff's own work*. *See* February 23, 2005 Letter from Marcia B. Paul to Richard F. Horowitz, attached as Ex. B to Paul Aff. While Plaintiff's counsel apparently may have thought that Defendants' counsel's warning letter was "typical lawyer bluster", *see* April 15, 2005 Letter from Marcia B. Paul to Richard F. Horowitz, attached to Reply Affidavit of Marcia B. Paul at Ex. A, I cannot see how anyone who actually read the February 23 letter would not have been prompted to do some investigation, which would have led to the discovery of the error. Plaintiff's counsel give no reasons for their failure to act. Although I do not necessarily attribute to Plaintiff's counsel an ill will, counsel's lack of care in the first instance, by failing to verify that the registration number cited in the complaint referred to the correct version of the work, compounded by Plaintiff's counsel's blatant failure to investigate and correct the mistake, even when given clear notice that such was necessary, directly resulted in Defendants' counsel's expenditure of time and effort drafting a motion to dismiss directed at the wrong work.

However, even if I were to conclude that some sort of sanction is justified based on the

foregoing, Plaintiff's counsel argue that sanctions cannot be imposed because Defendants have failed to comply with the technical requirement of the "safe harbor" provision of Rule 11(c)(1)(A). That subsection provides that a motion for sanctions "shall not be filed with . . . the court unless, within 21 days after service of the motion . . . , the challenged paper . . . is not withdrawn or appropriately corrected." Fed. R. Civ. P. 11(c)(1)(A). Plaintiff's counsel contend that they were served with the sanctions motion on May 6, 2005 (*see* Plaint. Rule 11 Mem. at 4), the very same day that the motion was filed with the court (*see* Dkt. No. 10). Plaintiff's counsel further claim that they corrected the alleged problem by filing the amended complaint, which referenced the correct version of Gal's screenplay, nine days later, on May 15, 2005. *See* Plaint. Rule 11 Mem. at 4. Therefore, Plaintiff's counsel posit, no sanctions are warranted.

Defendants counter that, while conceding that they did not technically comply with the service requirements of the Rule 11(c)(1)(A), they complied with the spirit of the rule by mailing Plaintiff's counsel a detailed letter stating that sanctions would be sought if the complaint were not withdrawn. *See* Defendants' Reply Memorandum in Support of Its Motion for Sanctions at 2-3. This letter, with the heading "Rule 11 Safe Harbor Letter," was sent 72 days before the sanctions motion was filed. *See id.*

Unfortunately for Defendants, however, the plain language of the rule states explicitly that service of the motion itself is required to begin the safe harbor clock -- the rule says nothing about the use of letters. "To stress the seriousness of a motion for sanctions and to define precisely the conduct claimed to violate the rule, . . . the 'safe harbor' period begins to run *only upon service of the motion*." Fed. R. Civ. P. Advisory Committee's note (emphasis added); *see Siegal v. Pro-Ex Sec.*, No. 02 Civ. 610, 2002 WL 1203851, at *3 (S.D.N.Y. June 3, 2002) (citing

the same Advisory Committee language). It does not seem overly demanding to require counsel to comply with the clear directives of Rule 11 when seeking sanctions under that rule. *See, e.g., Lancaster v. Zufle*, 170 F.R.D. 7 (S.D.N.Y. 1996) ("[T]he plain language of the Rule expressly requires the serving of a formal motion, and with good reason, for by serving such a motion a movant . . . places its adversary on notice that the matter may not be viewed as simply part of the paper skirmishing among adversaries that too often characterizes litigation in this uncivil age."); *but see Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 480 n.27 (S.D.N.Y. 2003) (defendants had "complied with Rule 11" despite failing to serve the motion 21 days prior to filing it with the court because defendants had sent a detailed warning letter giving plaintiff "sufficient notice of defendants' intent to move for sanctions and an opportunity to withdraw the offending papers" 21 days before filing the sanctions motion). Therefore, Defendants' motion for sanctions is denied.

## III. CONCLUSION

For the above-stated reasons, Defendants' motion to dismiss pursuant to Rule 12(b)(6) is hereby denied, as is Defendants' related request for an award of attorneys' fees and costs. Further, Defendants' motion for sanctions pursuant to Rule 11 is hereby denied.

Counsel are directed to appear before the Court for a status conference on Monday, December 19, 2005 at 10:30 a.m. in Courtroom 17C, 500 Pearl Street.

It is SO ORDERED.

Dated: New York, New York
December 5, 2005

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

25