UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
DALIA GAL, f/k/a DALIA GAL-BHELBER,    :        05 Civ. 0263 (CSH)
            :
         Plaintiff,      :
            :
    -against-       :        MEMORANDUM
            :     OPINION AND ORDER
VIACOM INTERNATIONAL, INC., SIMON & :
SCHUSTER, INC., THE THOMSON      :
CORPORATION, THOMSON GALE, INC.,  :
THORNDIKE PRESS, SIMON & SCHUSTER :
AUDIO, INC., a division of Simon & Schuster, :
Inc., POCKET BOOKS, INC., a division of  :
Simon & Schuster, Inc., and MARY HIGGINS :
CLARK,             :
            :
        Defendants.    :
------------------------------------------------------------- x

HAIGHT, Senior District Judge:

       In this action brought under the Copyright Act of 1976, as amended, 17 U.S.C. § 101 *et seq.*,

plaintiff Dalia Gal ("Gal"), the author of the unpublished screenplay *Immortalin* (the "Screenplay"),

alleges that the defendants infringed upon her copyright in the Screenplay through the publication

of a novel credited to defendant Mary Higgins Clark ("Clark") entitled *The Second Time Around* (the

"Novel").

       In an opinion dated December 5, 2005, and reported at 403 F. Supp. 2d 294 (S.D.N.Y. 2005)

("*Gal I*"), I denied motions made by defendants for dismissal of the action pursuant to Fed. R. Civ.

P. 12(b)(6) and for sanctions pursuant to Fed. R. Civ. P. 11.  Following discovery, defendants now

move under Rule 56 for summary judgment, and again for sanctions under Rule 11.  For the reasons

that follow, I grant defendants' motion for summary judgment and deny their motion for sanctions.

# I.  BACKGROUND

Plaintiff, a professional writer, asserts that she is the author of, and has at all relevant times held a valid copyright in, the screenplay *Immortalin*.  *See* Amend. Compl. ("Compl."), ¶¶ 3, 15-18. Mary Higgins Clark is a best-selling author of mystery thriller novels who has authored 34 novels over the past 30 years.  Aff. of Mary Higgins Clark, dated Oct. 5, 2006 ("Clark Aff."), ¶ 1.  Plaintiff contends that Clark's 2003 novel *The Second Time Around* unlawfully infringes on the Screenplay, which was completed in 2000, by including "themes and scenes that were substantially similar to and directly copied from the themes and scenes in the [Screenplay]."  Compl. ¶ 22.

## A.    The Two Works

In *Gal I*, the Court summarized and compared both works.  *See Gal I*, 403 F. Supp. 2d at 299-305.  I reproduce those summaries in full.  They form the necessary background for the Court's disposition of defendants' present motion for summary judgment.

### 1.    The Screenplay

The Screenplay opens at a press conference, held at the Grand Hyatt hotel in Manhattan, where a large drug company announces the results of its new "miracle" anti-aging drug, called Immortalin. Involved in the presentation by the company are two scientist/doctors, David Baron and Fred Leary, and the CEO of the company, Robert MacGreal. The main character of the story, Alice Greene,[1] is at the conference as a reporter for the New York Report; she is accompanied by her photographer, Mitch DeCarlo. The drug company's presentation is interrupted by an irate man, complaining that Immortalin trial treatment failed to cure his brother, and in fact made him worse. MacGreal asserts that the man's brother did not, in fact, receive Immortalin, but was given a placebo as part of the trial. Also at the conference, Baron is asked a question about the competing drug Grow, to which he responds by disparaging the competing drug.

After the conference, Alice undertakes to investigate the scientists involved in the Immortalin project. To that end, she attends a party hosted by MacGreal. At the party, Alice is introduced to Baron's attractive wife, Melissa. Alice later observes Melissa

---

[1] Alice is an attractive 28-year old divorcee with a young daughter.

using cocaine, as well as kissing MacGreal. At the same party, MacGreal's wife, Gloria, has a discussion with Bruce Lawrence, CEO of another large drug company (which produces Grow), wherein Gloria tells Lawrence that MacGreal will follow through with a deal between the two drug companies. Then the two CEOs meet to talk behind closed doors. When Alice later tells Bonnie, her friend and the medical correspondent at the paper, about the meeting between MacGreal and Lawrence, Bonnie guesses that Lawrence is trying to acquire the rights to Immortalin, in order to prevent the product from competing with Grow in the market.

On a later date, MacGreal informs Baron and Leary that he intends to sell the Immortalin rights to Lawrence, and he asks each of the scientists to sign a non-compete agreement. Baron, who is in the process of developing an improved generation of the drug, refuses to sign, and is fired. Leary signs the agreement.

Meanwhile, Alice's sick mother is treated with Grow, and her condition deteriorates. Bonnie tells Alice of a rumor regarding a new generation of Immortalin, which might be able to help Alice's mother.

Alice goes to the drug company's office to interview Leary and Baron about Immortalin, but Baron does not appear. Leary denies the existence of a new generation of the drug. Leary asks Alice out for drinks that night, and they have sex at his apartment. The next morning, Alice surreptitiously steals Melissa Baron's address from Leary's address book before leaving.

Apparently later that day, Alice intrudes upon a meeting between MacGreal, Lawrence, and Leary, demanding to know the whereabouts of the missing Baron. She mentions that she saw MacGreal and Baron's wife together at the party. Alice leaves without gaining any new information.

Later, Alice visits artist Melissa Baron in her East Village studio, asking after her husband. Meanwhile, outside on the street, Abraham Zacharias, who we later learn is a terrorist-for-hire, watches Melissa's apartment. Melissa is not happy about Alice's visit, and does not appear concerned about her missing husband. Melissa does, however, tell Alice that Baron's mentor, a Dr. Williams, may know his whereabouts. Alice then leaves, and goes to visit Williams. After some prompting, Alice earns Williams' trust, primarily by invoking her ill mother, who she hopes could be cured by Baron's most recent version of Immortalin. Williams tells Alice that Baron is staying at an apartment in Queens, scared into hiding. Alice then goes to visit Baron, and is followed by Zacharias, who has been tailing her.

Baron's apartment doubles as a lab. He admits Alice, who asks about the rumored new generation of Immortalin, on her mother's behalf. Baron admits that there have been attempts made on his life, and also mentions that his research records are located in the basement of his old house in New Jersey, which has been foreclosed

upon.

Meanwhile, in MacGreal's mansion, he and Gloria, his wife, discuss the consummation of the deal with Lawrence's drug company. MacGreal complains about Alice's snooping, and admits to staging a hit-and-run attempt on Baron. He also mentions pressure from Nord Biotech, a firm that apparently was also bidding on the rights to Immortalin.

At night, while Alice is home in her house, she notices Zacharias outside watching her. The next day, she reports this to Bonnie, who tells her she should alert the police. Meanwhile, Zacharias bugs Alice's home phone. Gloria connects with Zacharias after watching him trail Alice; Gloria hires him to get the rumored new generation of Immortalin for her, so that she can use it herself to reverse the flow of years, which have not been kind to her appearance.

Alice, using her home phone, calls Mitch to ask him to join her in visiting the foreclosed home where Baron's research is supposedly stashed. Zacharias hears this, and beats Alice and Mitch to the house. There, he steals computer files as well as vials of what appears to be the new Immortalin. When Alice and Mitch stumble upon Zacharias, he kills Mitch while Alice manages to escape. Alice manages to call the police, and they arrive on the scene after Zacharias has fled.

In the next scene, apparently the following day, Gloria and Lawrence meet for lunch, and she provides him with one of the vials stolen by Zacharias. Gloria wants Lawrence's labs to test the drug, with a view to injecting her with the contents.

At the newspaper, Alice, who had been investigating the Immortalin story without authorization, is placed on leave by the paper. She vows, however, to continue her investigation. To that end, she visits Baron at his apartment, where he reveals that the research and vials left at the foreclosed house were fake-the vials contained only an old derivative of Immortalin.

The next day, Alice arrives uninvited at the MacGreal mansion, where MacGreal and Gloria are engaged in a bitter fight about MacGreal's affair with Melissa Baron. Gloria tells Alice how much money MacGreal stands to make from selling the rights to Immortalin, in hopes that Alice will publish the numbers so that Gloria will not be cheated if they divorce. Gloria is angered when Alice informs her she is no longer working for the paper.

Later, while Alice is driving, her brakes fail and she crashes her car. Zacharias, who has been following Alice, makes a phone call, stating that Alice has been neutralized. Alice is hospitalized, but not mortally injured. Leary, who still has romantic feelings for Alice, visits her in the hospital. He also says that her accident was probably the result of someone trying to eliminate her, probably the same person who killed

4

Mitch. Leary also reveals that Baron was, in fact, working on a new generation of Immortalin, and that, as a result of the drug companies' deal to sell the rights to Immortalin, effectively keeping it off the market, Baron went into hiding to continue developing the drug. We also learn that Nord Biotech attempted to acquire Immortalin, but was outbid by Lawrence; Nord Biotech wanted the drug in order to develop germ warfare.

In the next scene, Gloria visits Lawrence's labs, to be injected with the stolen Immortalin, which she mistakenly believes is the new generation. However, she reacts badly to the injection (of an old derivative of Immortalin), and develops horrible boils all over her face. Gloria flies into a rage. Later, Gloria, still in a disturbed state, visits Melissa Baron at her apartment, demanding to know where Melissa's husband is keeping the new generation of Immortalin. A fight ensues, and Gloria kills Melissa. As she escapes from Melissa's apartment, Gloria encounters Zacharias, who has been looking for her to demand payment for supplying the stolen drug. When Gloria refuses to pay him, saying he stole the wrong drug, he kills her.

A day later, Alice and Leary visit Baron and Williams at Baron's apartment. Leary reveals that they have learned that Zacharias works for a terrorist organization that runs Nord Biotech, which organization is attempting to develop powerful germ weapons. Zacharias then arrives at the apartment, demanding the new generation Immortalin. A fight breaks out, and, after a violent struggle, Leary kills Zacharias.

Alice breaks the bioterrorism story and is rehired by the paper. Her mother is then treated with the new Immortalin developed by Baron, and shows dramatic improvement. The drug is rushed through the FDA approval process. Alice and Leary decide to begin a romantic relationship.

*Gal I*, 403 F. Supp. 2d at 299-302.

## 2.    The Novel[2]

The Novel's story is told through two alternating perspectives: (1) a first person account from the perspective of the protagonist, Marcia "Carley" DeCarlo, a 32-year old divorcee newspaper columnist;[3] and (2) a third person account from the perspective of Ned Cooper, an unbalanced man who snaps after his wife's accidental death and embarks on a vengeful killing spree. The Novel opens at a stockholders'

---

[2] This summary of the Novel was taken, with some changes, from defendants' brief in support of their motion to dismiss, which the Court found to be accurate. *See Gal I*, 403 F. Supp. 2d at 302 n.3.

[3] We learn that, some years before the commencement of the action in the Novel, Carley lost a baby to a heart defect. *See Gal I*, 403 F. Supp. 2d at 302 n.4.

meeting of Gen-stone, a company developing a promising cancer cure, held at the Grand Hyatt hotel in New York City. Two weeks earlier, its president and the inventor of the drug, Nick Spencer, was reportedly killed when his private place crashed. Thereafter, rumors began circulating that there had been serious setbacks in the ongoing drug experiments and that Spencer had looted the company. Carley, who is also the stepsister of Spencer's presumed widow Lynn, attends the meeting. Angry shareholders shout questions; one of them, Martin Bikorsky, claims that he will lose his house because he invested in the company in the hope of saving his cancer-stricken daughter. After the meeting, someone sets fire to Lynn's mansion. When she is hospitalized, Carley visits her.

The story then shifts to Ned's perspective. He is in the lobby of that same hospital where his wife Annie used to work. When Annie learned that he had sold their dream house to invest in Gen-stone, she drove off and was killed in an auto accident. Ned runs into a doctor who prescribes something for his hand (which we later learn was burned while setting fire to Lynn's mansion).

Carley is hired by a newspaper to do an in-depth profile of Nick, which gives her the opportunity to investigate his disappearance. She interviews the company's chairman, Charles Wallingford, and Dr. Celtavini, head of its labs, at their offices. Wallingford explains that another company, Garner Pharmaceuticals, had invested heavily in Gen-stone; he also speculates that Nick had been looting Gen-stone for years.

Carley again visits Lynn at the hospital, where the two are startled by a strange man (the crazed Ned, as we later learn), who excuses himself moments before the police arrive to question Lynn about the fire. The police already have a suspect for the arson: Bikorsky, one of the shareholders who interrupted the meeting. Carley then visits Dr. Broderick, an old Spencer family friend. Nick's father had been dedicated to finding a cancer cure; after he died, Nick gave Broderick his father's research. Shortly before the plane crash, Nick asked Broderick to return his father's notes and was upset to learn that a red-haired man from Gen-stone had already taken them.

Meanwhile, Ned's landlady, Mrs. Morgan, tells him he has to leave when his lease is up. Ned drives to the site of the dream house he and Annie once shared. He unsuccessfully tries to rent a room from an old neighbor, Mrs. Shafley, and then runs into Harry Harnik, the owner of their old house. Ned blames them all for Annie's death and decides to kill Lynn, Carley, Mrs. Morgan, Mrs. Shafley, Mr. Harnik and Harnik's wife, Bess.

Carley asks the two researchers at Gen-stone, Dr. Celtavini and Dr. Kendall, about the red-haired man. Celtavini denies knowledge of any such person and Carley gives Dr. Celtavini Broderick's number so he can investigate further. Carley then interviews Nick's secretary, Vivian Powers.

Meanwhile, as Ned plots the murders, he has stopped taking his medication, his burned hand is infected, and he has started talking to his dead wife.

Carley meets with Bikorsky, his wife, Rhoda and their cancer-stricken daughter Maggie. Rhoda persuaded Bikorsky to invest in Gen-stone after meeting Nick at a hospice. Carley is more convinced than ever that Bikorsky did not set the fire. She then learns that Broderick has been struck by a hit-and-run driver. A news report announces that a piece of Nick's clothing has been found near the site of the plane crash. Seeking to comfort Lynn, Carley finds her at her Manhattan apartment with Wallingford, Gen-stone's president, and others including Adrian Garner, the owner of Garner Pharmaceuticals, the company that had invested in Gen-stone.

Carley receives some threatening e-mails, including one that reads "Who was the man in Lynn Spencer's mansion a minute before it caught fire?" The suspicious circumstances of Broderick's hit-and-run accident persuade Nick's secretary, Vivian, to reveal to Carley not only that Nick had earlier tried to get his father's records (which Carley knew from Broderick), but that shortly before the plane crash, he nearly had an accident when his accelerator stuck. Carley now suspects that Nick has been murdered. She meets with the caretakers of the Spencer mansion who dislike Lynn (who is Nick's second wife). They reveal that Nick had a romantic interest in Vivian. Now, instead of murder, Carley wonders whether the plane crash was staged so that Vivian and Nick can be together. She visits the hospice where Nick volunteered and learns that he may have illegally given the drug to two patients, who quickly improved.

Ned goes to the pharmacy for something to treat his burned hand. When he thinks that the cashier Peg suspects him of starting the fire, he kills her.

Carley learns that Vivian has disappeared. News reports surface that Nick has been spotted in Switzerland. Both Carley and the police suspect that Vivian is on her way there to meet him.

After Ned gets a visit from two detectives investigating Peg's murder, he buries his rifle at Annie's grave. He realizes that he is the prime suspect in Peg's death and accelerates his plan to murder the others.

The police trace the threatening e-mails to someone claiming to be Nick Spencer and using the password "Annie". When Vivian's neighbor's car is missing, the police suspect that Vivian used the car to flee. Carley again visits Gen-stone and meets with Wallingford and a Garner Pharmaceuticals lawyer, Lowell Drexel.

Ned retrieves his rifle from Annie's grave and kills his landlady, Mrs. Morgan. He hears Annie's voice telling him next to kill his old neighbors.

7

Carley learns that Vivian has been found alive but unconscious in the neighbor's car.

Ned hides in one of the deserted buildings on Lynn's mansion grounds, waiting to kill Mrs. Shafley and the Harniks.

After another meeting with Drexel, Carley takes some Garner Pharmaceuticals pamphlets. She agrees to meet with Lynn the next day.

Meanwhile, Ned sees Lynn talking to the same man he had seen her with the night of the fire. Ned leaves, kills Mrs. Shafley and the Harniks, then returns.

Carley learns that Nick's former in-laws, who also invested in Gen-stone, took custody of Nick's son Jack after Nick married Lynn; they are convinced that Nick is dead, since he would never leave Jack.

Ned hears that the three bodies of his old neighbors have been found. The police suspect Ned of shooting them, as well as Peg and his landlady. He has just two more people to kill-Lynn and Carley.

Carley also learns of the killings and remembers seeing Ned at the hospital the day after the fire.

At the mansion, Ned overhears a message confirming a meeting between Lynn and Carley the next day. He plans to kill them both at that time.

On her way to the mansion, Carley stops at the airport where Nick began his ill-fated flight. She questions a waitress who overheard an argument between Nick and Lynn before his flight left, leading Carley to theorize that Nick did not fake his disappearance, and that Vivian was kidnapped. As she skims the Garner Pharmaceuticals pamphlets, she sees an old photo of the now-gray lawyer Drexel: he had red hair. Carley arrives at the mansion, confronts Lynn with her knowledge that Drexel is the mysterious red-haired man and that Lynn and Nick argued at the airport. Drexel enters holding a gun, but moments later Ned enters, shoots Drexel and Lynn, and then forces Carley to drive him to Annie's grave. En route, Carley realizes that Ned thinks he is talking to Annie, so she tells him that she would like to write a story about how much Annie loved him. At the cemetery, Ned threatens Annie, but then kills himself.

In the epilogue, we learn that Garner had masterminded the whole plot in order to sabotage the experiments, force Gen-stone into bankruptcy, and then acquire the patent on the sure-to-be-lucrative drug. He was having an affair with Lynn and gave her a pill to slip into Nick's drink at the airport. When it took effect several hours later, it knocked Nick unconscious, and he crashed the plane. Garner is indicted for murder. At a memorial service for Nick, Bikorsky's wife reveals that Nick had given

the vaccine to Maggie, who is well on her way to being cured.

*Id.* at 302-04.

**B.    Procedural History**

In *Gal I*, I denied defendants' motion to dismiss the complaint, holding that due to a number of similarities between the works, I could not conclude as a matter of law that no reasonable trier of fact could find the works "substantially similar" within the meaning of the applicable law.  I also denied defendants' motion for sanctions, notwithstanding my concern about the failure by counsel for plaintiff to correct his error in referencing the wrong version of the Screenplay, even after having been notified about discrepancies by defendants' counsel.

Solely for the purpose of their motion to dismiss, defendants had conceded access to plaintiff's Screenplay *Immortalin*.  Subsequent to the Court's denial of that motion in *Gal I*, the parties have engaged in extensive discovery.  The evidentiary record concerning access, previously conceded, has now been fully developed.  In addition, defendants have submitted evidence concerning other works written by Clark and other works in the mystery thriller genre.  This expanded record informs the Court's decision on defendants' motion for summary judgment.

## II.   DISCUSSION

**A.    Motion for Summary Judgment**

**1.    Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law

governing the case will identify which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [that party's] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). However, "mere conclusory allegations, speculation or conjecture" are insufficient for a non-moving party to resist summary judgment. *Cifarelli v. Vill. of Bablyon*, 93 F.3d 47, 51 (2d Cir. 1996). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. *See Vargas v. Transeau*, No. 04 Civ. 9772, 2007 WL 1346618, at *6 (S.D.N.Y. May 9, 2007) (summary judgment in favor of defendants in copyright infringement action may not be avoided merely by producing an expert who testifies that the plaintiffs' musical composition was sampled, regardless of how conclusory the statement may be and whether it contradicts testimony of plaintiffs' other witnesses); *Tisi v. Patrick*, 97 F. Supp. 2d 539, 549 (S.D.N.Y. 2000) (issue of fact cannot be created merely by recitation by plaintiff's expert of "the magic words 'strikingly similar' and 'no possibility of

independent creation'") (citation omitted).

## 2.   Copyright Infringement

### a.  Basic Requirements

Copyright law does not protect an idea, but only "the expression of an idea."   *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996) ("*Williams*").   In order to prevail on an infringement action, a plaintiff must prove "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Id.* (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)).

In the case at bar, defendants do not challenge Gal's claim to a valid copyright in the Screenplay.  The Court's focus is therefore on the second requirement, that of unauthorized copying. The Second Circuit has held, "To demonstrate unauthorized copying, the plaintiff must first show that his work was actually copied; second he must establish substantial similarity or that the copying amounts to an improper or unlawful appropriation, i.e., (i) that it was protected expression in the earlier work that was copied and (ii) that the amount that was copied is more than de minimis." *Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) (internal quotation marks and citation omitted).

Thus as an initial matter, a plaintiff must show that the defendant "actually copied" his or her work.  *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001).  Actual copying may be shown by either direct or indirect evidence.  *Id*.  "In the absence of direct evidence, copying is proven by showing (a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works."  *Williams,* 84 F.3d at 587 (internal quotation marks and

citation omitted).[4]

When establishing copying by circumstantial evidence, "[t]here is an inverse relationship between access and probative similarity such that the stronger the proof of similarity, the less the proof of access is required." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 56 (2d Cir. 2003) ("*Jorgensen*") (citation and internal quotation marks omitted). Thus, "[i]f the two works are so strikingly similar as to preclude the possibility of independent creation, copying may be proved without a showing of access." *Repp*, 132 F.2d at 889 (citation omitted). Conversely, where the plaintiff has not demonstrated access, he or she must show that the works are not just "substantially similar" but "strikingly similar." *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir. 1946) ("If evidence of access is absent, the similarities must be so striking as to preclude the possibility that plaintiff and defendant independently arrived at the same result."). *See Vargas*, 2007 WL 1346618, at *3 ("Plaintiffs concede that access has not been proven and, therefore, rely solely on the contention that [the works] are strikingly similar."); *Mowry v. Viacon Int'l, Inc.*, No. 03 Civ. 3090, 2005 WL 1793773, at *9 (S.D.N.Y. Jul. 29, 2005) (because plaintiff did not demonstrate access, "defendants are entitled to summary judgment unless access can be inferred from 'striking similarities'" between the two works); *Cox v. Abrams*, No. 93 Civ. 6899, 1997 WL 251532, at *4 (S.D.N.Y. May 14,

---

[4] Once copying has been shown, a plaintiff must still demonstrate "substantial similarity" between the defendant's work and the protectible elements of plaintiff's work, because "not all copying results in copyright infringement." *Boisson*, 273 F.3d at 268 (citations omitted). The presence of a "substantial similarity" standard in two parts of the test (i.e. as a requirement for demonstrating copying and subsequently as a requirement for demonstrating *unlawful* copying) has caused some confusion. The Second Circuit has observed, "In an effort to clarify this confusion, we have noted that the term 'probative similarity' should be used when referring to the initial burden of proving copying by establishing access and/or similarities. After a plaintiff has proved copying, he or she must then show that the copying was unlawful by establishing 'substantial similarity' between the works at issue." *Repp & K&R Music, Inc. v. Webber*, 132 F.3d 882, 889 n.1 (2d Cir. 1997) (citation omitted).

1997) (finding that since plaintiffs offered no evidence indicating access, "[u]nless a reasonable jury could find striking similarity between [the two works], summary judgment based on lack of access is proper").

"Striking similarity exists when two works are so nearly alike that the only reasonable explanation for such a great degree of similarity is that the later was copied from the first." *American Direct Mktg, Inc. v. Azad Int'l, Inc.*, 783 F. Supp. 84, 95 (E.D.N.Y. 1992) (internal quotation marks and ellipses omitted). *See also Vargas*, 2007 WL 1346618, at *3 ("The court's task is to apply logic and experience to determine if copying is the only realistic basis for the similarities at hand.") (citation and internal quotation marks omitted). Stated otherwise, "similarity is determined if an ordinary person could aesthetically recognize the copy as the appropriated work." *Mowry*, 2005 WL 179773, at *10 (citation omitted). The "striking similarity" test is "stringent." *Vargas*, 2007 WL 1346618, at *5. It requires, not surprisingly, more than a showing of "substantial similarity." *See id.*; *Mowry*, 2005 WL 1793773, at *10 n.15. *See also Jorgensen v. Careers BMG Music Pub.*, No. 01 Civ. 0357, 2002 WL 1492123, at *5 (S.D.N.Y. July 11, 2002) ("*Careers BMG Music*") (plaintiff failed to show striking similarity where his expert "conclude[d] that the songs at issue [were] only 'substantially similar' and not 'strikingly similar'").

As mentioned *supra*, in *Gal I* the defendants had conceded access solely for the purpose of their motion to dismiss under Rule 12. In consequence, the Court was obliged to assume that the access prong of copying was satisfied for the purpose of that motion; and the sole question became whether a jury question existed as to "substantial similarity" between the two works or, in the Second Circuit's more recent language, "probative similarity" between them. *See Repp*, 132 F.3d at 889 n.1. However, on this post-discovery summary judgment motion, defendants most

emphatically do *not* concede access; and the factual question of whether any of the defendants or persons in their employ had access to the plaintiff's Screenplay is a critical component of the analysis.  If sufficient evidence in the record exists from which a reasonable juror could find or infer access, the similarity standard remains the same as in the prior motion to dismiss.  If, however, there is insufficient evidence in the record from which a reasonable juror could find or infer access, summary judgment is appropriate unless the two works meet the more stringent "strikingly similar" standard.

### b.  *Application of the Law to this Case*

#### i.  **Access**

Access means that an alleged infringer had a 'reasonable possibility' – not simply a bare possibility' – of hearing [or seeing] the prior work; access cannot be based on mere 'speculation or conjecture.'"  *Jorgensen*, 351 F.3d at 51.  To support a claim of access, a plaintiff must offer "significant, affirmative and probative evidence."  *Id.*  Since it is rare in a copyright infringement action for plaintiff to have direct access of the defendant viewing and copying its work, courts have recognized that access may be shown by circumstantial evidence.  *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 99 (2d Cir. 1999).  As proof of access, a plaintiff may show that "(1) the infringed work has been widely disseminated or (2) a particular chain of events exists by which the defendant might have gained access to the work."  *Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d 516, 519 (S.D.N.Y. 2000).

Plaintiff does not maintain that the Screenplay was widely disseminated.  Where a work is unpublished, as in the case at bar, it is considered not to have been widely disseminated.  *See Mowry*, 2005 WL 1793773, at *4; *Silberstein v. Fox Entm't Group, Inc*, 424 F. Supp. 2d 616, 627 (S.D.N.Y. 2004) ("This court has consistently recognized widespread dissemination giving rise to an inference

of access exclusively in cases where the allegedly infringed work has had considerable commercial success or is readily available on the market."). Nor has plaintiff submitted evidence suggesting that any of the defendants are linked to her unpublished Screenplay through a chain of events. Gal conceded that she herself never submitted her Screenplay to any of the defendants or persons employed by defendants who were involved in the creation of Clark's Novel, and that she had no knowledge that any of the people to whom she had sent or shown any version or part of her Screenplay had shown it to any of the defendants or anyone connected with them. *See* Gal Tr., Ex. G to Aff. of Marcia B. Paul in Supp. Mot. Summ. J., dated November 1, 2006 ("Paul Aff."), at 137-55. In their testimony, Clark, as well as her editors, Michael Korda and Chuck Adams, consistently stated that Korda and Adams were the only persons who helped Clark substantively with her Novel by providing editorial comments. The only other persons involved with the Novel prior to the finalization of the manuscript were a production editor, Gypsy da Silva, and a copy editor, Rose Ann Ferrick, both of whom were also deposed in this case. All these individuals testified unequivocally and without contradiction that they had never heard of Gal or of her Screenplay before this lawsuit. Clark Tr., Ex. I to Paul Aff. ("Clark Tr."), at 17-18; Korda Tr., Ex. J to Paul Aff. ("Korda Tr."), at 29; Adams Tr., Ex. K to Paul Aff. ("Adams Tr."), at 31, 42; Da Silva Tr., Ex. L to Paul Aff. ("Da Silva Tr."), at 30; Ferrick Tr., Ex. M. to Paul Aff. ("Ferrick Tr."), at 18-19.

Courts have rejected efforts by plaintiffs to establish access in the face of such sworn testimony unless there is probative evidence to the contrary. *See Cox*, 1997 WL 251532, at *4 (sworn testimony of defendants controverted plaintiff's speculative theory of access). Even where there is evidence that a defendant publishing company *received* a work that a plaintiff alleges was infringed by a work published by that company, courts have found that corporate receipt alone is

15

insufficient to establish a chain of events leading to *access*, as that concept is used in copyright law. *Jorgensen*, 351 F.3d at 48 ("[E]vidence of corporate receipt of unsolicited work is insufficient to raise a triable issue of access where there is no evidence of any connection between the individual recipients of the protected work and the alleged infringers."). Here, plaintiff has not established even such a partial chain of events as receipt of her Screenplay by defendant Simon & Schuster, much less a chain of events that could lead a reasonable juror to find that the persons involved in the creation of Clark's Novel had access to her Screenplay.

Instead of establishing a chain of events, plaintiff argues that access can be inferred from the speed with which Clark wrote the Novel.[5]  Plaintiff also maintains that the "utter dearth of documents produced during discovery showing any groundwork by Defendants for the Novel" indicates that defendant "will not be able to prove independent creation to refute Plaintiff's circumstantial showing of access."  Pl.'s Mem. in Opp'n, at 2-3.

Plaintiff's theory of access based on speed of creation is both unpersuasive and insufficient to raise a jury question as to access.  At her deposition, Clark described her writing process, both in general and specifically with respect to *The Second Time Around*.  She testified that she produces a mystery thriller novel every year and that she usually begins researching and writing at some point in the Fall and completes the novel around January or February of the following year.  Clark Tr. at 21; Clark Aff. ¶ 11.  The book is published in the Spring of that year, following which Clark

---

[5] Defendants also suggest that plaintiff advances a theory of access based on a rumor she heard that ghostwriters contribute to the writing of Clark's novels and her speculation that her Screenplay may have made it into the hands of one such ghostwriter.  *See* Def.'s Mem. in Supp. Summ. J. ("Def.'s Summ. J. Mem."), at 12 (citing Gal Tr. at 156).  Gal does mention the rumor of a ghostwriter very briefly in her deposition, but nowhere in plaintiff's brief does she advance the ghostwriter rumor as a legal theory of access, and I pay it no further heed.

embarks on a two-month publicity tour, which typically ends in or about early June.  Clark Aff. ¶¶ 9, 10.  In some years, Clark and her daughter Carol Higgins Clark collaborate on a "Christmas book," which is a mystery set in the Christmas season, and the two authors promote that book together directly following its publication.  *Id.* ¶¶ 4, 5.  In the years in which Clark produces a Christmas book, she stated, "I do not begin the intense writing of my next novel until somewhat later, and then, wholly devote my time to writing that novel over a three to four-month period to meet my deadline."  *Id.* ¶ 11.

Korda has been Clark's editor at Simon & Schuster ("S&S") for over 30 years, joined for the past 15 years by Adams, another S&S editor.  Korda, Adams, and Clark all testified as to the writing and editing process for Clark's works.  After Clark completes approximately 25 pages or one or two chapters, she faxes them to Korda, who reviews them.  Clark Tr. at 30; Korda Tr. at 16-17.  He discusses the segment with Clark and then forwards his edits to Adams, who conducts a more detailed line-edit.  Korda Tr. at 27; Adams Tr. at 16-17.  Adams then forwards the edited pages for copyediting, after which the pages are typeset and passed back to Clark for final approval.  Korda Tr. at 28-29; Adams Tr. at 18; Da Silva Tr. at 20.  The entire process is repeated for each batch of manuscript pages that Clark faxes to Korda.

Clark testified that for this particular Novel, her initial conception was a book about a corporate scam, based on personal experience.  Clark Tr. at 28; Clark Aff. ¶ 12.  She did not recall any specific discussion with Korda and Adams, but she stated that she probably did have a discussion with them in the Spring of 2002 because each Spring she is required to outline the basic plot of her upcoming novel for the publisher's catalog copy.  Clark Tr. at 27; Clark Aff. ¶ 8.  She testified that in or around December of 2002 she became aware of the Imclone scandal and decided

17

to focus specifically on the pharmaceutical industry as a result of it.  Clark Tr. at 32; Clark Aff. ¶ 13. *See also* Korda Tr. at 21.  Clark testified that she began the "nitty-gritty" writing in the "fall of 2002, late fall," Clark Tr. at 26; elsewhere she said that she "did not start writing intensely until about early December 2002." Clark Aff.  ¶ 14.  By "nitty gritty" she testified that she meant that she would "give every waking hour, which there were many, to the writing of that book."  Clark Tr. at 26-27.  She said that she finished writing "in or about the end of February." Clark Aff. ¶ 15.  The book was released in April 2003.  Clark Aff. ¶ 15.

Plaintiff's attempt to show that there is a factual dispute as to these dates is unavailing. Plaintiff quibbles with defendants' statement that the manuscript for *The Second Time Around* was completed "at the end of February 2003" by maintaining that because the entire editing process was "not completed later than February 28, 2003," according to the deposition testimony of defendants' witnesses, "Clark's writing was necessarily completed *sometime before* the end of February 2003." Pl.'s Response to Def.'s Stmt. Pursuant to Local Rule 56.1 ("Pl.'s Rule 56.1 Response"), ¶ 24.  This is not a material discrepancy (if it is a discrepancy at all), since the question turns only on how long a span of time is encompassed by "the end of February."  Due to the nature of Clark's particular process for creating her novels, it is certainly conceivable that Clark faxed her editors the last batch of pages sometime around the final week of February and the two finished editing those pages before the bell tolled the final hour of that month.

Plaintiff also argues that, in contrast to the time frame described by defendants, Clark commenced writing of the Novel in "late December 2002" or "just before Christmas 2002."  *See* Pl.'s Rule 56.1 Response; Pl.'s Mem. in Opp'n, at 10.  But I do not derive "late December" or "just before Christmas" from Clark's statements that "the actual writing started late in the game in 2002,"

18

Clark Tr. at 22, and "the real definite concentration day in and day out started in December 2002."
*Id*. Plaintiff also references page 58 of the deposition transcript, which I gather is the source of Clark's alleged statement that she "seriously got to work on [drafting the Novel] in *late* December," *see* Pl.'s Mem. in Opp'n, at 9 (emphasis in original). But since plaintiff does not submit this portion of the transcript herself and instead refers the Court to portions of the transcript attached as exhibits to an affidavit submitted by defendants, which do not include page 58, there is no evidence in the record on this motion to support plaintiff's contention that Clark made this statement referencing "late December." Even if there were, given that there is a certain flexibility in the phrases "seriously got to work," "nitty gritty," and "writing intensely" used to describe the concentrated writing process for the Novel, I hold that one mention by Clark that she "seriously got to work" in "late December" does not contradict her statement that she commenced "writing intensely" in "about early December."

I find no material issue of fact in the record before me. It is clear that Clark commenced writing the Novel sometime in early December of 2002 and finished it sometime towards the end of February 2003. A simple calculation leads me to conclude that it took Clark something shy of three months to write this Novel.

The question, then, is whether this is a suspiciously short time period, and if it is, whether suspicious alacrity constitutes evidence from which a reasonable juror could infer that Clark had access to the Screenplay. Plaintiff asserts that writing a book in the amount of time it took Clark to write *A Second Time Around* is suspiciously short "by Defendant Clark's own writing standards." Pl.'s Mem. in Opp'n, at 11. To support this proposition, plaintiff cites to Clark's affidavit, where Clark stated that her "concentrated writing process spans approximately five to six months, starting

in the Fall to about January or February the following year." Clark Aff. ¶ 11 (cited in Pl.'s Mem. in Opp'n, at 11). Plaintiff, in other words, would have me compare this time frame falling short of three months to Clark's estimate of "five to six months" as her ordinary time frame for the concentrated writing process. However, plaintiff fails to cite the sentence immediately following the quoted one in Clark's affidavit, where Clark states, "In the years I collaborate with my daughter on our 'Christmas book', however, I do not begin the intense writing of my next novel until somewhat later, and then, wholly devote my time to writing that novel over a three to four-month period to meet my deadline." *Id.* Since Clark did write a Christmas book in 2002, the year in which she also began writing *The Second Time Around*, *see id.* ¶ 14, the five to six month time frame proffered by plaintiff is inapposite, and three to four months is the appropriate time frame. For Clark to have completed *The Second Time Around* in something shy of three months is hardly a dramatic departure from this estimated period.[6]

The interviews cited by plaintiff concerning Clark's general practice are not to the contrary. *See* Aff. of Richard F. Horowitz, dated January 4, 2007 ("Horowitz Aff."), Exs. 1-4. In an interview with USA Today's Book Club on January 2, 2003, in answer to the question "How long, on average, does it take you to write a book?" she stated, "From the time I finish one book, the other one is in my head. The hard work on it takes about six months." Horowitz Aff., Ex. 4, at 4-5. This corresponds with what she said in her affidavit, as being the time frame for the hard work on a novel

---

[6] I also note that Clark's senior editor Korda described Clark's habitual time frame for the actual writing process as taking around *two* months: "Generally speaking, with Mary's [i.e. Clark's] annual novel, they're published on Mother's Day, and Mary works on the plot, or begins working on the plot, around October or November. . . . and then she writes the book during December and January. . . ." Korda Tr. at 18-19. This is just as short a time frame as the two months suggested by plaintiff as being suspiciously short.

in years in which, unlike the year at issue here, she does *not* publish a Christmas book.  In a Barnes & Noble interview on May 23, 1997, she stated that "[e]ach book takes about a year now."  Horowitz Aff., Ex. 2, at 5.  If Clark's initial idea-vetting process in the Spring of 2002 is counted, the entire process *did* take her a year for *The Second Time Around*.  She never said that she spends an entire year on the writing process.

In sum, I am unable to discern any evidence in the record from which it could reasonably be found or inferred that Clark's time-frame for writing the Novel in this suit was suspiciously compressed, given her habitually brisk schedule and her even tighter scheduling for the years in which she produces a Christmas book.  That it took her something shy of three months of intense writing (which she describes as working day and night) to produce a 300-page novel with generous margins and relatively large font is certainly impressive,[7] but in the context of her customary writing process it is insufficient to raise an inference that she had access to plaintiff's Screenplay.[8]  *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1248 n.4 (11th Cir. 2007) (upholding summary judgment against plaintiff in copyright action and noting that district court "specifically rejected" plaintiff's argument that "unusual speed" in which theme park was created was enough to create an inference of access to plaintiff's painting where plaintiff failed to show that the time period in which defendant's park was created was unusually short by comparison to industry standards); *Hergoz v.*

---

[7] Plaintiff continually refers to Clark's novel as a "400-page" novel, *see* Pl.'s Mem. in Opp'n, at 8, 10, 13.  This length might perhaps refer to the manuscript's length, but it does not refer to the length of the published Novel, which is what is commonly meant when the length of a novel is described.  Because the actual published Novel is 302 pages long, I consider it to be instead a 300-page novel.

[8] Indeed, acclaimed literary works have been written in much less time.  Jack Kerouac wrote the first draft of *On the Road* in three weeks.  Stendhal wrote *The Charterhouse of Parma* in 52 days.

*Castle Rock Entm't*, 193 F.3d 1241, 1256 (11th Cir. 1999) ("Plaintiff has not shown that three months is unusually short for a screenplay of the same length as 'Lone Star,' either by comparison to film industry standards or the author's own works.").  I therefore hold that no reasonable juror could conclude that defendants had a reasonable opportunity to see or read plaintiff's Screenplay.

Even if Clark's speed were somewhat suspicious (which it is not), courts only consider alacrity of creation as *one* factor among others indicating that copying had occurred.  *See Design Tex Group, Inc. v. U.S. Vinyl Mfg. Corp.*, No. 04 Civ. 5002, 2005 WL 2063819, at *2 (S.D.N.Y. Aug. 24, 2005) ("compressed time frame" of creation of defendants' wallcovering pattern taken into account in finding that the "strikingly similar" pattern copied that of plaintiffs).  Speed of creation alone has never raised an issue of fact as to access.  Since access "must be more than a bare possibility and may not be inferred through speculation or conjecture," but rather plaintiff must "offer significant, affirmative and probative evidence of access," *Tomasini*, 84 F. Supp. 2d at 519 (citation and internal quotation marks omitted), plaintiff has fallen far short of meeting this standard.

Because plaintiff has raised no issue of fact regarding access, copying may only be proven through a demonstration that the two works are "strikingly similar."  Plaintiff's reliance throughout her brief on the "law of the case" doctrine is therefore misplaced, because invocation of that doctrine presumes that on this motion the Court is to evaluate the two works according to the same "substantially similar" standard it applied to the earlier motion to dismiss.  Because of my holding regarding access here, that more lenient standard is now inapplicable and, consequently, so are my conclusions in *Gal I* regarding its application to the two works.

### ii.  Striking Similarity

"If . . . a plaintiff has failed to produce indirect evidence of copying (by demonstrating both

access and 'probative similarities'), he or she may defeat a motion for summary judgment by showing that the works in question are 'strikingly similar.'" *Dimmie v. Carey*, 88 F. Supp. 2d 142, 149 (S.D.N.Y. 2000). Two works are considered "strikingly similar" if "creation of one is so dependent on the other as to preclude the possibility of independent creation." *Id.* (*citing Repp*, 132 F.3d at 889) (internal quotation marks omitted). As discussed *supra* in Part II.A.2.a, it is a stringent test. The mere existence of multiple similarities is insufficient to meet the test. *See, e.g.*, *American Direct Marketing*, 783 F. Supp. at 95 (television commercials for tooth whitening system not strikingly similar despite similarities that included blond female principal models, a girl with braces, similar five-part lists of plaque, and other similar layouts). The works must be so strikingly similar that copying is the only realistic basis for them. *See Vargas*, 2007 WL 1346618, at *3.

On defendant's earlier motion to dismiss, I held that similarities between the Screenplay and the Novel, when compared side by side, prevented me from finding that no reasonable juror could conclude that the two were "substantially similar." While similarity is generally a question of fact for a jury, summary judgment is appropriate on the issue where "the similarity concerns only noncopyrightable elements of plaintiff [sic] work or no reasonable trier of fact could find the works . . . similar" to the requisite degree. *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) (citation omitted). Comparing the two works through the lens of the more stringent "striking similarity" standard, and presented with additional evidence of third party works introduced into the record by defendants, I hold that no reasonable trier of fact could find the two works strikingly similar.

First, I revisit and enlarge upon my side by side comparison between the two works. In *Gal I*, I noted certain "obvious differences" between the Novel and the Screenplay and mentioned three:

23

> Most significantly, the Novel tells its story through two different, interrelated viewpoints, those of Carley in the first person and Ned in the third person, while the Screenplay has a single third person perspective. Additionally, the Screenplay has no character really analogous to Ned, whose "story" comprises a significant part of the Novel. Further, it bears noting that there is no terrorism subject matter in Defendants' work, as there is in Plaintiff's.

*Gal I*, 403 F. Supp. 2d at 307. The first of these differences concerns the narrative structure of the two works. Narrative structure is an important part of the expression of a literary work, and differences in narrative structure have been deemed significant in holding that the two works do not even meet the more lenient standard of substantial similarity. *See, e.g.*, *Kretschmer v. Warner Bros.*, No. 93 Civ. 1730, 1994 WL 259814, at *9 (S.D.N.Y. Jun. 8, 1994) (pace and structure of works "very different" where one plot was "neatly divided in two halves" whereas the other "deals almost exclusively" with the adventures of the main character).

The second and third of these differences implicate plot and theme. Another significant difference in plot is the different motivations animating the two protagonists, apart from their professional roles as reporters – the sickness of Alice's mother in the Screenplay, as opposed to Carley's family connection with Nick in the Novel. The romances in the two works are also very different, as Carley's love interest is an old friend and the love story develops as a completely separate plot element, whereas Alice's love interest is a key player in the primary plot.

Differences between the two works in character, tone, and theme are still more significant. Alice is an aggressive character, barging into the private corporate meeting, self-consciously playing the sleuth (such as when she rips an address out of Leary's address book while he is otherwise engaged); whereas Carley is more modest and methodical. Since these are the two protagonists, differences in their portrayal impact the overall feel of the works. *See Flaherty v. Filardi*, 388 F.

Supp. 2d 274, 287-88 (S.D.N.Y. 2005) (no substantial similarity where, among other elements, characters of the protagonists in each work were different); *Williams v. Crichton*, 860 F. Supp. 158, 168-69 (S.D.N.Y. 1994), *aff'd* 84 F.3d 581 (2d Cir. 1996) (no substantial similarity where plaintiff selected only a few characters as the basis for similarity and where characters in plaintiff's work were "much more thinly developed than those of [defendant's]").  The story of Ned is not only a major plot element particular to the Novel but one that adds significantly to the Novel's tone by adding a dark psychological thread.  In addition to this theme of psychological unraveling that runs through the Novel but not the Screenplay, a theme of community mistrust and disappointment (and anguish for those whose family members have cancer) also plays a prominent role in the Novel alone.

Indeed, the thrust and feel of both works are different: overall, *Immortalin* is a thriller focusing on the pettiness and greed of corporate elite, whereas *The Second Time Around* is a mystery drama and a psychological thriller.  For instance, while both the Screenplay and the Novel feature affairs involving the spouses of high-ranking pharmaceutical corporate executives, their treatment is entirely different: in *Immortalin* these affairs are known to the characters and serve to showcase the fast-rolling and dissolute nature of corporate culture, whereas in *The Second Time Around* the unrevealed identity of Lynn's lover provides a significant source of suspense – and, ultimately shock value – to the story.  In the Screenplay, Baron is not so much missing as he is difficult to locate for a short time; the suspense of the story derives not from a mystery surrounding his disappearance, as the reader learns relatively quickly where he is, but rather from the race of various persons to obtain the new generation of the drug he is making.  In the Novel, by contrast, the reader's interest is captured by the unresolved mysteries that abound – the mysteries of Nick's disappearance, his

character, possible other versions of the drug, the sabotaging of persons connected with the drug, Lynn's affair – and which are only revealed in the final denouement.  The reader's attention is also maintained by the suspense of created by Ned's descent into madness and violence and his increasing proximity to the main characters in the story, as well as by the suspense created by other violent incidents that add to the reader's fear for Carley's safety.  *Immortalin* therefore has the concept and feel of a race-to-the-cure thriller; *The Second Time Around* is a suspenseful mystery and thriller – with mysteries sustained on a number of fronts – and a dark psychological component playing a major role.

Since copyright law does not protect an idea, but only "the expression of an idea," *Williams*, 84 F.3d at 587, the works must share a "similarity of expression."  *Hogan*, 48 F. Supp. 2d at 309 (similarity of expression evinced by "similarities of treatment, details, scenes, events and characterization, or a similarity in their total concept and feel") (internal quotation marks and citations omitted).  Differences in total concept and feel are of great significance when determining the degree of similarity between the two works.  *See Williams*, 84 F.3d at 589 (affirming summary judgment against plaintiff children's author and holding that "the total concept and feel of the two works differ substantially" where defendants' works are "high-tech horror stories with villainous characters and gruesome bloodshed" and plaintiff's are "adventure stories and, although suspenseful in places, have happy endings."); *Mowry*, 2005 WL 1793773, at *11 (while both works possess the idea of a television program based on secret recording of a person's life, works not strikingly similar due to differences in plot, theme, character, mood, setting, and total concept and feel); *Hogan*, 48 F. Supp. 2d at 311 (difference in plaintiffs' and defendants' expression of similar ideas, "including the differences in [the works'] total look and feel, the interactions of the characters and the plot," are

26

"so pronounced" as to preclude finding of substantial similarity); *Cox*, 1997 WL 251532, at *6-*7 (finding of striking similarity precluded by differences in tone, plot elements, and development of characters in two works about the recovery of a male lawyer subjected to a brain injury).

While it is true that dissimilarities between the works will not serve to automatically relieve the infringer of liability, as "no copier may defend an act of plagiarism by pointing out how much of the copy he has not pirated," *Rogers v. Koons*, 960 F.2d 301, 308 (2d Cir. 1992), these differences are not only relevant but are of even greater significance when the standard applied is that of striking similarity. *See, e.g.*, *Price v. Fox Entm't Group, Inc.*, 05 Civ. 5359, 2007 WL 1259101, at * 3 (S.D.N.Y. Apr. 27, 2007) (no striking similarity between plaintiffs' 2001 screenplay *Dodgeball: The Movie* and defendants' 2004 movie *Dodgeball: A True Underdog Story* because "no rational juror could find that the works are so similar as to preclude coincidence and independent creation"); *Cox*, 1997 WL 251532, at *6-*7 (no striking similarity due to differences between the works); *Corwin*, 475 F.3d at 1248 n.5, 1254 (affirming district court's holding that due to differences enumerated by the court between defendant's theme park and plaintiff's painting, there was no genuine issue of material fact as to whether the two were strikingly similar). In *Price* the court held, "Although various similarities do exist [between the two works] . . . there are sufficient dissimilarities that foreclose a finding of striking similarity." *Id.* The Court's side by side comparison between *Immortalin* and *The Second Time Around* yields the same conclusion here.

Additionally, examination of the context of Clark's other works and the genre as a whole indicates that many of the similarities shared by the works are common to the mystery/thriller genre as a whole and/or Clark's own prior works. Courts have found context of this type to diminish the relevance of similarities between the works, because stock elements will not be considered:

27

"[m]aterial or themes commonly repeated in a certain genre are not protectible by copyright," nor are "so-called *scenes à faire.*" *American Direct Marketing*, 783 F. Supp. at 95. *See Brown v. Perdue*, No. 04 Civ. 7417, 2005 WL 1863673, at *8 (S.D.N.Y. 2005) (noting, in response to plaintiff's argument that Dan Brown's *The Da Vinci Code* infringed on his thriller that also incorporates religious themes, that the ideas and themes "find their origin in historical facts, events and figures, as well as pre-existing works"); *Tisi*, 97 F. Supp. 2d at 543 (structural similarities between parties' musical compositions "are not significant because they are uniformly shared with most modern popular rock music"); *Historical Truth Prods., Inc. v. Sony Pictures Entm't, Inc.*, No. 93 Civ. 5529, 1995 WL 693189, at *8 (S.D.N.Y. Nov. 22, 1995) (noting that "conspiracies" and "advanced technology" are "unoriginal and uncopyrightable stock elements of the action-adventure and science fiction film genres"); *Jones v. CBS, Inc.*, 733 F. Supp. 748, 754 (S.D.N.Y. 1990) ("basic plot ideas" not protectible); *Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F. Supp. 980, 986 (S.D.N.Y. 1980) (shared characteristics of both parties' Santa toys of a "traditional red suit and floppy cap, trimmed in white, black boots and white beard" and "nose like a cherry" are common to all Santas and therefore not probative of copying).

The following are elements present in both the Screenplay and the Novel: 1) a corporate meeting held at the Grand Hyatt (though it is a corporate announcement meeting in the Screenplay and a shareholder meeting in the Novel); 2) a female journalist protagonist; 3) the development of a miracle drug (an anti-aging drug in the Screenplay and an anti-cancer drug in the Novel); 4) an inventor of a drug who disappears; 5) an affair between the inventor's wife and another corporate executive; 6) competing pharmaceutical companies; 7) a murder; 8) a hit-and-run accident; 9) the names "DeCarlo," "Lynn," and "Greene." *See* Def.'s Summ. J. Mem., at 18. Defendants, however,

cite a number of third party works featuring corporate greed in the pharmaceutical industry and centering around the development of miracle drugs.  I take judicial notice of three cited by defendants and listed in Exhibit O to the Paul Affidavit.  One is *The Delta Factor*, by Thomas Locke (1994), in which two scientists work on a miracle drug to conquer viral disease and are entwined in a net of corporate greed and deception.  In *Elixir*, by Gary Braver (2001), a chemist journeys to the fountain of youth but becomes a target for a manhunt when his bosses discover that he has successfully synthesized a formula for immorality.  In *The Cure*, by Jack Hunter (2003), companies vie to own the next potential cure for cancer, making use of corporate espionage, blackmail, and murder; the scientist even dies in a suspicious plane crash.[9]  Defendants also cite to third party works involving a female investigative reporter, but as this is clearly a stock feature of many novels, I will not even take judicial notice of cited examples.  Finally, defendants point out that many features of the Novel that Gal claims to be similar to her own Screenplay are common features in Clark's *own* prior novels.  Five novels by Clark cited by defendants all feature the following elements: 1) a smart and successful young female protagonist, who has undergone a tragic experience in her life; 2) the protagonist's profession involves investigating; 3) a love story involving the protagonist, which has a happy ending; 4) a murder; 5) the presence of law enforcement; 6) a mystery which the protagonist plays an instrumental role in solving; 7) danger to the protagonist at some point in the story.  *See* Def.'s Summ. J. Mem., at 20 (citing *The Cradle Will Fall, All Around the Town, I'll Be Seeing You, Let Me Call You Sweetheart,* and *Daddy's Little Girl*).

When viewed in this larger context, many of the similarities between the Screenplay and the

---

[9] These summaries are taken, with only some slight condensing, from defendants' main summary judgment brief, at 19-20.

Novel are indeed either stock elements of Clark's own works, or general elements of the thriller genre, or plot elements that naturally flow from the similar idea of the two works (namely, the corporate greed surrounding the development of a miracle drug). *See Hogan*, 48 F. Supp. 2d at 310 ("The two works share a similar basic underlying idea: they both involve a half-vampire character who is on a quest that leads him to discover his origins. Almost all of the remaining similarities between the works are unprotectable themes and concepts that flow predictably from this idea."); *American Direct Marketing*, 783 F. Supp. at 95 (similar content and organization of commercials are largely "common items when one considers the genre of television commercials for direct telephone sale of consumer goods"). The character names shared between the two works are common names and are used differently in the two works,[10] and courts have not placed a great deal of emphasis on similarities in character names. *See Hogan*, 48 F. Supp. 2d at 300, 311 (no substantial similarity despite the fact that the two works both "centered around a half-human, half-vampire character named Nicholas Gaunt"); *Sinicola v. Warner Bros.*, 948 F. Supp. 1176, 1187 (E.D.N.Y. 1996) (no substantial similarity found "notwithstanding a number of identical or similar character names"). While the presence of certain similarities between the Novel and the Screenplay met the "substantial similarity" test on a motion to dismiss based purely on a side-by-side comparison of the works, they do not suffice to pass the "strikingly similar" test, in light of the significant differences between the works and considering the two in the context of the genre and Clark's other prior novels.

---

[10] "Lynn" is the first name of Lynn Spencer, a main character in the Novel, and the last name of a smaller character in the Screenplay; Dr. "Greene" is a minor character in the Novel, whereas Alice Green is the Screenplay's protagonist; Carley "DeCarlo" is the Novel's protagonist, whereas Mitch DeCarlo only occupies a minor supporting role in the Screenplay.

Since plaintiff has not presented any circumstantial evidence from which a reasonable juror could conclude that Clark actually copied plaintiff's Screenplay, there is no need for defendants to present evidence of independent creation in rebuttal.  Indeed, when the analysis is whether the works are strikingly similar, "[t]o show a striking similarity, Plaintiffs must demonstrate that there is *no* possibility of independent creation." *Vargas*, 2007 WL 1346618, at *5 (emphasis in original).  Thus, evidence of independent creation introduced by defendants can serve to bolster a finding of a lack of striking similarity.  *See id.* at *6 (defendants succeed in "bolster[ing] their argument that striking similarity is lacking with evidence of independent creation").  In this case, the sworn testimony of Clark and her colleagues, detailing the genesis of the idea in Clark's personal experience with a corporate scam as well as in the Imclone scandal and detailing the writing and editing process itself, is evidence of independent creation.  *See, e.g.*, *Corwin*, 475 F.3d at 1247 (testimony by persons employed in design, planning, and construction of theme park constituted evidence of its independent creation).  I also find that Clark's notebook with approximately 25 pages of notes on the Novel provides some evidence of independent creation.  Plaintiff is dismissive of this notebook, finding it too paltry for a novel's outline and apparently considering it significant that "no early drafts of the Novel were produced." Pl.'s Mem. in Opp'n at 2.  Not only do I find that the notebook does outline portions of the Novel, as many pages are broken into subsections with short descriptions of scenes, *see* Ex. 7 to Horowitz Aff.; but plaintiff's apparent expectation of "early drafts" is misplaced, given the ongoing writing and editing process detailed by Clark and her editors and rehearsed by plaintiff herself in her papers on this motion.  *See* Pl.'s Mem. in Opp'n, at 9-10.  Since I credit Clark's deposition testimony and affidavit, the deposition testimony of her colleagues, and the workbook with notes on the plot of the Novel, and none of this evidence has been impeached or

rebutted, *see Cox*, 1997 WL 251532, at *7-*8 (defendants' unrebutted sworn testimony as to work's genesis is evidence of independent creation), I conclude that this evidence of independent creation further buttresses defendants' argument that there is no triable issue of fact on striking similarity.

Pre-trial discovery in this case has caused every witness with any knowledge of the pertinent facts to submit affidavits or be deposed, and every pertinent document to be produced. It is impossible to imagine what evidence, testimonial or documentary, would be elicited at a full plenary trial that would add to the record of this case. Having considered all the evidence in the record, I hold that no reasonable juror could find that the works are "strikingly similar," which in the absence of any proof of access is the level of similarity plaintiff must show to justify an inference of copying. Because plaintiff cannot make the threshold showing of copying by direct or indirect evidence, I do not reach any further stage in the analysis or address any alternative bases for dismissal, and the defendants are entitled to summary judgment dismissing plaintiff's complaint.

### 3.     Attorney's Fees and Costs

The Copyright Act empowers a court to "award a reasonable attorneys' fees to the prevailing party" in an infringement action. 17 U.S.C. § 505. In *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 527 (1994), the Supreme Court stated that "defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." The Court identified a number of non-exclusive factors a district court should consider in determining whether to award attorney's fees: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at 534 n.19 (internal quotation marks and citation omitted). The

Court determined that "such factors may be used to guide courts' discretion, so long as such factors are faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner." *Id.*

Defendants seek the awarding of attorney's fees because "Gal's assertion of access based on a wholly unsupported rumor while having full knowledge of the absolute lack of nexus between Gal and defendants, is not only objectively unreasonable, but is patently frivolous and sanctionable." Def.'s Summ. J. Mem., at 24.  This is a reference to the previously noted ghostwriters rumor, *see* n.5, *supra*.  However, the notion of a ghostwriter came up only in a short exchange in Gal's deposition.  It was never a legal theory advanced by counsel for plaintiff.  Because it was not advanced as a legal theory, its frivolousness or non-frivolousness has not been considered by the Court.  In consequence, awarding attorney's fees on this basis would be inappropriate, and I decline to do so.

**B.** **Motion for Sanctions**

Defendants seek sanctions, available under Fed. R. Civ. P. 11(c), for violations of Fed. R. Civ. P. 11(b), *infra*:

> By presenting to the court . . . a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief . . . the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; [and] the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. . . .

Fed. R. Civ. P. 11(b)(2)-(3).  Defendants argue that sanctions under these provisions are warranted because "[f]rom the outset, as discussed at length above, there simply was no factual or legal basis

for plaintiff's claim of copyright infringement," and in addition plaintiff's counsel "persists in prosecuting this action even after engaging in the proverbial fishing expedition through discovery to try to uncover some shred of evidence of access." Def.'s Sanctions Mem., at 24. Defendants maintain that they "move for Rule 11 sanctions because [counsel for plaintiff] filed a complaint for copyright infringement . . . that completely lacks evidentiary support for access, a requisite element of a claim for copyright infringement." Def.'s Sanctions Mem., at 1. Defendants fault plaintiff for pressing her claim when "[u]nder these circumstances, a reasonable attorney would not have instituted this action, not to speak of continuing it once discovery failed to produce a shred of evidence." *Id.* at 1.

Defendants argument fails. First, the Court's denial of defendants' motion to dismiss undermines the argument that plaintiff's copyright infringement action was utterly baseless. Second, plaintiff's theory of access was not frivolous. Plaintiff's theory did indeed rely principally on the speed with which the Novel was created, arguing that the unusual speed, combined with Clark's dearth of preparatory notes, sufficed to create an issue of fact for the jury. This theory of access is weak and, I have concluded, not borne out by facts which cannot reasonably be disputed, but it was based on case law indicating that unusual alacrity of creation can be a factor in determining whether reasonable access existed. It was therefore not a frivolous or misleading legal argument of the type that would warrant sanctions. *See Historical Truth Productions*, 1995 WL 693189, at *15 (sanctions under Rule 11 appropriate where plaintiff misrepresented the content of the two works in question because such misrepresentations appeared to be an attempt to deceive the court).

Finding nothing in counsel for plaintiff's conduct deserving of sanctions, I deny defendants'

34

motion to impose them.

### III.  CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.  The Clerk

of the Court is directed to dismiss plaintiff's complaint with prejudice and without leave to replead.

Defendants' motion for sanctions, fees and costs is denied.

It is SO ORDERED.

Dated: New York, New York
September 18, 2007

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

35